In re Peter C. LORDY and Virginia
M. Lordy, Debtors.

Robert C. FURR, Trustee, Plaintiff,

v.

Peter C. LORDY and Virginia
M. Lordy, Defendants.

EMPLOYERS INSURANCE
OF WAUSAU, a Mutual
Company, Plaintiff,

v.

Peter C. LORDY and Virginia
M. Lordy, Defendants.

Bankruptcy No. 96–31947–BKC–PGH.
Adversary Nos. 96–0929–BKC–PGH–
A, 96–0939–BKC–PGH–A, 96–
0625-BKC–PGH–A.

United States Bankruptcy Court,
S.D. Florida.

July 28, 1997.

Lee S. Osborne, Furr and Cohen, P.A., Boca Raton, FL.

Kevin C. Gleason, P.A., Boca Raton, FL.

Gerard Kouri, Jr., Davie, FL.

James Mulvaney, Louis Modugno, McElroy Deutsch & Mulvaney, Morristown, NJ.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAUL G. HYMAN, Jr., Bankruptcy Judge.

**THIS MATTER** came before the Court upon the Complaints of the Chapter 7 Trustee, Robert C. Furr (the "Trustee"), and Employers Insurance of Wausau, a Mutual Company ("Wausau") objecting to the Debtors', Peter C. and Virginia M. Lordy (the "Debtors"), claimed exemptions based upon the Debtors' failure to establish their domicile in Florida for the greater part of 180 days immediately preceding their voluntary petition pursuant to 11 U.S.C. § 522(b)(2)(A). The Trustee and Wausau further object to the Debtors' receiving a discharge pursuant to section 727(a)(2)(A) of the Bankruptcy Code. In addition, the Trustee objects to the Debtors' receiving a discharge pursuant to sections 727(a)(3), (4), and (5) of the Bankruptcy Code. The adversary proceedings were consolidated for trial and a two day trial was held on February 27 & 28, 1997. The Court, having heard the testimony and observed the demeanor of the witnesses, observed and examined the evidence presented, having heard the arguments of counsel, and being otherwise fully advised in the premises, hereby enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

**The Indemnity Action And Asset Transfers By The Debtors**

The Debtors filed a voluntary petition under Chapter 7 of the Bankruptcy Code on May 9, 1996, and Robert C. Furr was appointed the Chapter 7 Trustee. The Debt-

ors, Peter Lordy and Virginia Lordy, were the president and vice president, respectively, of Direct Environmental, Inc. ("Direct"). Virginia Lordy was also Direct's sole shareholder. On December 7, 1992, the Debtors', individually and on behalf of Direct, executed a General Indemnity Agreement in favor of Wausau (the "1992 GIA"). On February 17, 1995, the Debtors, individually and on behalf of Direct and Holly Construction executed a second General Indemnity Agreement (the "1995 GIA") in favor of Wausau. (Peter Lordy, Virginia Lordy, Direct and Holly Construction will be collectively referred to as the "Indemnitors.")

Under the terms of the 1992 GIA and 1995 GIA, the Indemnitors agreed, jointly and severally, to indemnify Wausau against any and all liability, loss, cost, damages, attorneys fees and other expenses which Wausau might sustain or incur by reason of, or in consequence of, having executed any bonds on behalf of any of the Indemnitors. The Indemnitors jointly and severally agreed that if Wausau set a reserve to cover any liability, claim asserted, suit or judgment on any bond, they would deposit with Wausau a sum equal to the reserve as collateral security. The Indemnitors also jointly and severally agreed to deposit sums equal to any subsequent increases in the reserve.

On March 2, 1994, Wausau, as surety, at the request of the Debtors and Direct, and on behalf of Direct, as principal, issued a performance bond and a labor and material payment bond pursuant to 40 U.S.C. § 270a in favor of the United States of America by and through the Department of Interior, National Park Service, as obligee, in connection with a contract (Contract No. 1443CX400094901) between Direct and the United States of America for improvements at the Steamtown National Historic Site, Lackawanna County, Pennsylvania (the "Steamtown Bonds"). On December 1, 1994, Wausau, as surety, at the request of the Debtors and Direct, and on behalf of Direct, issued another performance bond and a labor and material payment bond (the "Gateway Bonds") in favor of the United States of America by and through the Department of Interior, National Park Service, as obligee, in connection with a contract (Contract No. 1443CX160095901) between Direct and the United States of America for improvements at the Gateway National Recreation Center Facilities and Utilities Package in Staten Island, New York (the "Gateway Contract").

In June of 1994, as part of the inducement to have Wausau issue bonds, the Debtors and/or Direct provided Wausau with their Statement of Financial Condition dated March 31, 1994. The Statement of Financial Condition listed the following real properties and their respective values:

| ASSET | VALUE |
|---|---|
| 337 East Avenue, Bay Head, NJ | $ 1,400,000 |
| 440 Club Drive, Bay Head, NJ | $ 365,000 |
| 127 Cypress Street, Millburn, NJ | $ 345,000 |
| 240–290 Sanford Street, E. Orange, NJ | $ 300,000 |

Seven months later, by a deed dated October 25, 1994, the Debtors transferred their interest in the real property located at 240–290 Sanford Street, East Orange, New Jersey (the "East Orange Property") to Pellam Realty Limited Partnership ("Pellam"). Pellam paid the Debtors $50,000 and executed a promissory note in favor of the Debtors in the amount of $235,000 (the "Pellam Note"). The Pellam Note was secured by a mortgage on the East Orange Property and was for a term of five (5) years with monthly payments in the amount of $3,000 commencing on November 1, 1994, and ending on November 1, 1999.

Eleven months after the transfer of the East Orange Property, on September 2, 1995, the United States of America (the "United States") declared Direct in default on the Gateway contract. Following the declaration of default, the United States made a demand of Wausau under the Gateway Bonds. Thereafter, on November 20, 1995, Wausau filed a lawsuit in the United States District Court for the District of New Jersey against the Indemnitors (the "Indemnity Action"). Wausau alleged that Direct was in default on the Gateway Contract and that a demand had been made of Wausau under its performance bond by the United States. Wausau further alleged that subcontractors and labor and material suppliers on both the Gateway and Steamtown Contracts had placed Wausau on notice of claims against the payment bonds because Direct had not

paid these subcontractors and suppliers. Wausau demanded judgment against each of the Indemnitors for all damages incurred, and to be incurred, by Wausau. To date, Wausau has paid in excess of $5 million under the bonds and continues to face exposure and to accrue costs, attorneys' fees and expenses.

On November 15, 1995, Direct filed a voluntary petition under Chapter 11 of Bankruptcy Code in New Jersey. On December 13, 1995, Direct commenced an adversary proceeding seeking injunctive relief against Wausau, the United States, and any claimants against the Wausau bonds. In its verified complaint Direct sought to (1) extend the automatic stay to the Debtors; (2) enjoin Wausau from commencing suit against Debtors under the GIAs; (3) enjoin the United States from enforcing any obligations of Wausau under the bonds; and (4) enjoin both Wausau and the United States from paying claimants under the bonds. In addition, paragraph 35 the verified complaint alleged:

> 35. The Lordys have not presently filed for personal bankruptcy. Given their stake in Direct Environmental, however, it is very likely that the Lordys will be forced to personally file for bankruptcy protection if Direct Environmental fails to reorganize and/or if Wausau pursues them under the Indemnity Agreement.

The New Jersey Bankruptcy Court denied the relief requested by order dated January 3, 1996, and, consequently, the Indemnity Action proceeded.

Six days after the New Jersey Bankruptcy Court denied Direct's request for an injunction, the Debtors listed their real properties located at 337 East Avenue, Bay Head, New Jersey (the "East Avenue Property") and 127 Cypress Street, Millburn, New Jersey (the "Millburn Property") for sale. At trial, Peter Lordy testified that the properties were listed under a multiple listing agreement and that he told his realtor that the Debtors "wanted to move" the East Avenue Property. On January 30, 1996, the Debtors accepted the second offer they received on the East Avenue Property. At the time of the sale, the tax assessed value on the East Avenue Property was $914,700.00, however, the Debtor's sold the property for only $705,000.00. Shortly after the Debtors accepted the offer on the East Avenue Property, on February 8, 1996, the Debtors entered into a contract to sell the Millburn Property for $325,000.00.

Beginning in January of 1996, the Debtors also began making arrangements to relocate to Florida. These arrangement included the transfer of assets in order to be able to designate them as exempt under Florida law. For example, on April 15, 1996, the Debtors purchased a home in Boca Raton, Florida, at 333 Northeast Spanish Trail (the "Spanish Trail Property") for $578,107.00. The dates of other significant asset transfers by the Debtors are as follows:

| DATE | EVENT |
| --- | --- |
| November 24, 1995 | Peter Lordy withdrew $7,500.00 from the Debtors' joint account at the Bank of New York (account # 616–207283). |
| December 6, 1995 | Virginia Lordy wrote a check made payable to Charles Schwab in the amount of $6,225.00 (check # 1115) from the Debtors' joint bank account at the Bank of New York (account # 610–2136819). |
| January 5, 1996 | Virginia Lordy withdrew $10,000.00 from the Debtors' joint priority savings account at the Bank of New York (account # 616–207283). |
| January 16, 1996 | Virginia Lordy redeemed $15,000.00 worth of shares held in the Debtors' joint account at Dreyfus General Municipal Bond Fund (account # 106–0218603678). |
| January 17, 1996 | Debtors opened Great Western Bank account in Florida with an initial deposit of $1,500.00 (account # 631–825324–9). |
| January 29, 1996 | Virginia Lordy withdrew $6,000.00 from the Debtors' joint savings account at the Bank of New York (account # 616–2072836). |
| January 30, 1996 | Peter Lordy entered into a contract with Carl Palo, Vanessa Palo, Vincent Tedesschi and Rachel Tedesschi for the sale of the East Avenue Property for $705,000.00. |
| February 8, 1996 | Debtors entered into a contract with Michael S. Feuer and Emily A. Feuer for the sale of the Millburn Property for $325,000.00. |
| February 13, 1996 | Debtors redeemed stock through Charles Schwab and received a check in the amount of $19,918.00. |
| February 20, 1996 | Peter Lordy redeemed $63,500.00 worth of shares held in the Debtors' joint account at Dreyfus General Municipal Bond Fund (account # 106–0218603678). The proceeds were used as the deposit on the Spanish Trail Property. |

| | |
|---|---|
| February 22, 1996 | Debtors withdrew $1,704.90 from their joint checking account at the Bank of New York (account # 616-2071929). |
| February 27, 1996 | Peter Lordy sold a Mercedes Benz for $25,000.00. |
| February 27, 1996 | Debtors entered into an Agreement of Sale with Richard Visceglia and Mary Lou Visceglia for the sale of the real property located at 440 Club Drive, Bay Head, NJ for $233,000.00. |
| February 27, 1996 | Peter Lordy wrote a check payable to Delray Mitsubishi in the amount of $6,665.00 for the prepayment of a lease on a Mitsubishi Montero. |
| March 7, 1996 | The note and mortgage held by the Debtors on the East orange Property was discharged of record by a Discharge of Mortgage, dated February 13, 1996. The Debtors received $170,000.00 for the Pellam Note. The Pellam Note was sold for a discount of $45,430.57 or 21%. |
| March 15, 1996 | Peter Lordy transferred, by deed, the real property located the East Avenue Property to Carl Palo, Vanessa Palo, Vincent Tedesschi and Rachel Tedesschi. Mr. Lordy received net proceeds of $441,071 from the sale and deposited the funds in the Debtors' joint account at the Great Western Bank. |
| March 25, 1996 | Debtors transferred, by deed, the Millburn Property, to Michael S. Feuer and Emily A. Feuer. The Debtors received net proceeds of $184,433 from the sale and deposited the funds in their Great Western Bank account. |
| March 26, 1996 | Virginia Lordy withdrew $5,000.00 from the Debtors joint savings account at the Bank of New York (account # 616-2072836) and deposited the funds together with a check from Direct in the amount of $1,667.00 in the Debtors' joint checking account at the Bank of New York. |
| March 28, 1996 | Debtors withdrew $800,000.00 from their checking account at Great Western Bank and deposited the funds into a savings account at the Great Western Bank. |
| April 1, 1996 | Virginia Lordy wrote a check to James Lordy, the Debtors' son, in the amount of $1,704.90. The check was drawn on the Debtors' joint checking account at the Bank of New York (account # 610-2136819). |
| April 10, 1996 | Peter Lordy wrote a check made payable to Ginger Lordy, his daughter, in the amount of $1,750.00. |
| April 15, 1996 | Debtors transferred $578,106.51 to E.J. Kunman, Trustee for Walter F.H. Mattlage Revocable Trust, in consideration for the Spanish Trail Property. |
| April 23, 1996 | Debtors withdrew $2,699.00 from their Great Western Bank account. |
| April 23, 1996 | Virginia Lordy deposited a check dated April 12, 1996 from Direct in the amount of $1,677.05 in the Debtors' joint account at the Great Western Bank. |
| April 24, 1996 | The amount of $223,955.00 was wire transferred into the Debtors' joint checking account at the Great Western Bank account. |
| April 24, 1996 | Peter Lordy withdrew $150,035.00 from the Debtors' joint checking account at Great Western Bank. |
| April 24, 1996 | Debtors purchased a Flexible Premium Deferred Variable Annuity from Northbrook Life Insurance company for $150,000.00 (certificate no. 182070). |
| April 25, 1996 | Debtors signed a Deed and Affidavit of Title for the transfer of the real property at 440 Club Drive, Bay Head, NJ. |
| April 28, 1996 | Peter Lordy wrote a check payable to Curry College in the amount of $22,000.00 to prepay college tuition. |
| April 30, 1996 | Peter Lordy wrote a check payable to Citibank Advantage in the amount of $8,431.81. The check was drawn upon the Debtors' joint checking account at the Great Western Bank. |
| April 30, 1996 | Peter Lordy wrote a check payable to Chubb Insurance Co. in the amount of $2,135.00. The check was drawn upon the Debtors' joint checking account at the Great Western Bank. |
| May 1, 1996 | Peter Lordy wrote a check payable to Cigna Individual Insurance in the amount of $3,121.03. The check was drawn upon the Debtors' joint checking account at the Great Western Bank. |

While these transfers were taking place, Peter Lordy, on behalf of the Debtors, repeatedly called Wausau concerning the Debtors indemnity obligations. On February 29, 1996, Peter Lordy spoke with Ann Tambornino, Senior Bond Claim Representative of Wausau, and represented to her that the Debtors were interested in resolving their

indemnity obligations with Wausau but they needed more time. Peter Lordy again called Ms. Tambornino on March 6, 1996, and advised her that the Debtors were still interested in reaching a resolution with Wausau but that he needed to speak with his attorney first. He told Ms. Tambornino that he was scheduled to meet with his attorney on March 13, 1996. On March 14, 1996, Peter Lordy left a message with Ms. Tambornino stating that he was busy with clients and that he would attempt to get back to her during a break. One week later, on March 21, 1996, Peter Lordy again phoned Ms. Tambornino and left a message for her that the Debtors would like to continue to negotiate with Wausau. Ms. Tambornino returned Peter Lordy's call on the same day and advised him that his attorney should contact Wausau's counsel. From that point forward, neither Peter Lordy nor his counsel contacted Wausau or its counsel. On April 5, 1996, the Debtors' filed their answer in the Indemnity Action.

In April of 1996, Wausau learned of the sale of the Millburn Property and the satisfaction of the Pellam Note. On April 24, 1996, Wausau filed an application in the Indemnity Action for an order directing the Debtors to show cause why an order should not be entered to, *inter alia*, (1) permanently enjoin Debtors from transferring, assigning, mortgaging, pledging or otherwise disposing of their assets; (2) compel Debtors to account for any proceeds obtained from the sale or other disposition of any assets owned by them as of March 31, 1994, including the proceeds from the sale the East Avenue Property, the Millburn Property, and the East Orange Property; (3) compel Debtors to turn over the proceeds from the sale of these assets; (4) compel the Debtors to post with Wausau the sum of $5,103,561.00 as collateral for losses already sustained and likely to be sustained by Wausau and permit Wausau to use any amounts so posted to satisfy the obligations of the Debtors, granting judgment in favor of Wausau in the sum of $5,103,561.00; (5) and provide Wausau with a complete accounting of all assets subject to the order. On April 24, 1996, the Honorable Alfred Wolin subsequently entered an Order To Show Cause With Tempo-

rary Restraints (the "Temporary Restraining Order") and a copy of was served on Timothy C. Neumann, Esquire, the Debtors' attorney, immediately following the hearing. The Temporary Restraining Order specifically enjoined the Debtors from:

> selling, conveying, transferring, mortgaging, pledging, liquidating, encumbering, reducing or otherwise disposing of any of their respective assets, including but not limited to, any and all real or personal property in which [the Debtors] have a legal or equitable interest and any and all proceeds derived from the sale or other disposition of any and all real or personal property or other assets owned or held by them directly or indirectly since March 31, 1994.

Despite the express restrictions contained in the Temporary Restraining Order, the Debtors continued to transfer assets. As indicated above, on April 24, 1996, the Debtors withdrew $150,000.00 from their Great Western Account and purchased the variable annuity from Northbrook Life Insurance. On April 25, 1996, the Debtors signed a Deed and Affidavit of Title to convey the real property at 440 Club Drive, Bay Head, New Jersey (the "Club Drive Property"). In addition, Peter Lordy wrote checks from the period April 28, 1996, through May 1, 1996, payable to Curry College, Citibank Advantage, Chubb Insurance, and Cigna Individual Insurance in the amounts of $22,000.00, $8,431.81, $2,135.00 and $3,121.03, respectively. These checks were written to pre-pay tuition and other expenses of the Debtors even though the Debtors typically did not pre-pay these types of expenses.

On May 7, 1996, in response to the Temporary Restraining Order, the Debtors' filed the Certification Of Peter Lordy In Reply To Order To Show Cause With Temporary Restraints' (the "Debtors' Reply"). In the Debtors' Reply, Peter Lordy certified that:

> 5. With regard to the allegations that plaintiff has made that my wife and I are attempting to remove our assets from the reach of the plaintiff in the event that it is successful in obtaining a judgment against us in this case, I have not undertaken any

sales of the New Jersey real estate which was listed in financial statements given to the plaintiff in an attempt to transfer assets out of our names. My wife and I are still in possession of the proceeds of the sales of real estate and we have not transferred assets out of our name or transferred any assets or proceeds of the sales out of the United States.

On May 8, 1996, a hearing was held on the Temporary Restraining Order and Judge Wolin entered an Order (the "May 8th Order") requiring the Debtors to appear on May 9, 1996, to deliver certified checks representing the proceeds from the sale or other disposition of any assets by the Debtors. The May 8th Order also re-enforced the restraints imposed by the Temporary Restraining Order. The day after Judge Wolin signed the May 8th Order, the Debtors filed their joint voluntary petition under Chapter 7 of the Bankruptcy Code in the Southern District of Florida.

**The Debtors Attempt To Establish A Florida Domicile.**

As indicated above, the Debtors' began making arrangements to move to Florida in January of 1996. On January 15, 1996, the Debtors visited Florida and then returned to New Jersey five days later on January 20, 1996. During this brief visit, the Debtors stayed with friends and leased an apartment at 940 Sweetwater Lane, in Boca Raton, Florida (the "Boca Raton Apartment"), on a month to month basis. The lease was scheduled to commence on February 1, 1996. The Debtors also shopped for a home and entered into a contract to purchase the Spanish Trail Property.

On January 20, 1996, the Debtors returned to New Jersey and remained there for eleven days. Then, on January 31, 1996, the Debtors returned to Florida in their Mercedes Benz automobile. The very next day, February 1, 1996, the Debtors obtained Florida voter registration cards and Peter Lordy filed a sworn Declaration of Domicile. In his Declaration of Domicile, Peter Lordy attested under oath that he intended 940 Sweetwater Lane, Apartment 305, to be his permanent home; that it constituted his predominant and principal home; and that he

intended to continue it permanently as his predominant and principal home. Peter Lordy also certified that he did not maintain any other place of abode. At trial, Virginia Lordy testified that she did not remember filing a Declaration of Domicile.

On February 7, 1996, after only seven days in Florida, the Debtors again returned to New Jersey. At trial, Peter Lordy testified that he next returned to Florida on February 24, 1996, via Continental Airlines. He then testified that he returned to New Jersey on March 8, 1996. No evidence was presented to contradict his testimony.

Peter Lordy next testified that he travelled to Florida on March 15, 1996, the day of the closing on the East Avenue Property, and remained in Florida until March 25, 1996, the day the of the closing on the Millburn Property. The only evidence which supports Peter Lordy's assertion are two deposit slips from the Great Western Bank in Florida reflecting deposits made to the Debtors' account on March 20, 1996, and March 21, 1996. On the other hand, there were no credit card charges in Florida between March 15, 1996, and March 25, 1996, despite the Debtors' prior conduct of making credit card charges at Florida businesses on their trips to Florida. In addition, the Debtors' Florida telephone records do not reflect any phone calls made during that period even though on prior trips to Florida, the telephone records show a pattern of outgoing long distance calls from Florida on a daily basis. Moreover, it is undisputed that the Peter Lordy called Ms. Tambornino on March 21, 1996, however, there is no record of that telephone call on the Debtors' Florida telephone records. The evidence also showed that Peter Lordy was in New Jersey on March 22, 1996, when he executed a bill of lading on behalf of North American Van Lines in connection with the shipping of the Debtors' personal belongings to Florida. Accordingly, this Court finds that Peter Lordy was in New Jersey on and after March 21, 1996. This Court further finds that there is no evidence to suggest that Virginia Lordy was in Florida during this same period. Peter Lordy next testified that he returned to Florida on March 28, 1996, after the closing

on the East Avenue Property. According to Peter Lordy, he did not return to New Jersey before the May 9, 1996, the Debtors' petition date. Finally, until March 22, 1996, Peter Lordy was employed by and received payroll checks from Direct.

At trial, no evidence was introduced that Virginia Lordy joined her husband on his February 24, 1996, trip to Florida. Furthermore, Virginia Lordy testified that she was present in New Jersey on March 19, 1996, when she deposited $1,700.95 in the Debtors' joint checking account at the Bank of New York in New Jersey. She also testified that she was in New Jersey on March 26, 1996, when she withdrew $5,000.00 from the Bank of New York and that she again visited the Bank of New York on April 6, 1996. In addition, the Debtors' credit card charges from March 10, 1996, through April 11, 1996, place at least one of the Debtors in New Jersey during this period because purchases were made in both New Jersey and Florida during this time. At trial, Peter Lordy was questioned regarding who made the charges reflected on the April 19, 1996, credit card statement. He testified that they were made by he and Virginia Lordy. The Court further finds that Virginia Lordy was employed by and received payroll checks from Direct through April 12, 1996. Thus, this Court finds that Virginia Lordy was physically present in New Jersey from March 7, 1996, up to and including April 12, 1996.

**The Debtors' Chapter 7 Petition and Schedules.**

The Debtors' filed for Chapter 7 protection on May 9, 1996, and filed their original bankruptcy schedules on June 14, 1996. On their schedules, the Debtors claimed the following properties as exempt pursuant to Florida law:

| PROPERTY | BASIS FOR EXEMPTION | VALUE |
|---|---|---|
| 1988 Montero | FSA § 222.25(1) | $ 1,000.00 |
| 1988 Pontiac LeMans | FSA § 222.25(1) | $ 1,000.00 |
| Florida Power & Light | Art. 10, § 4(a)(2) FSA § 222.061 | $ 200.00 |
| 333 NE Spanish Trail (homestead) | Art. 10, § 4(a)(1) FSA §§ 222.01 & 222.02 | $645,000.00 |
| Household Furnishings: 3 Bedroom sets; dining tables and chairs; 3 sofas; T.V.; 5 lamps; stereo | Art. 10 § 4(a)(2) FSA § 222.061 | $ 3,500.00 |
| MFS/Sun Life of Canada # 65 6500 370489 | FSA § 222.14 | $ 24,683.91 |
| MFS/Sun Life of Canada # 65 6500 370773 | FSA § 222.14 | $ 4,130.05 |
| MFS/Sun Life of Canada # 65 6500 370648 | FSA § 222.14 | $ 17,376.98 |
| MFS/ Sun Life of Canada # 65 6500 370345 | FSA § 222.14 | $ 52,646.03 |

| | | |
|---|---|---|
| North Brook Life<br>Account # 1270898670036 | FSA § 222.14 | $150,000.00 |
| Prudential<br>Securities<br>Account # OWD–R01661–22 | FSA § 222.21 | $ 33,103.49 |
| Prudential<br>Securities<br>Account # OWD–R01637–22 | FSA § 222.21 | $ 14,161.00 [1] |
| Various Household<br>Tools | Art. 10 § 4(a)(2)<br>FSA § 222.061 | $ 30.00 |
| Various family<br>photos | Art. 10 § 4(a)(2)<br>FSA § 222.061 | $ 0.00 |
| Wearing Apparel | Art. 10 § 4(a)(2)<br>FSA § 222.061 | $ 0.00 |
| MBL Life Assurance<br>Newark, NJ<br># GA 10095 0001<br>(* listed on Sept. 25, 1996 amended petition) | FSA 222.14 | $ 30,963.72 * |
| MBL Life Assurance<br>Newark, NJ<br># GA 10095 0002<br>(* listed on Sept. 25, 1996 amended petition) | FSA § 222.14 | $ 34,035.11 * |

In addition, the Debtors' original Statement of Financial Affairs (the "SFA") showed only one transfer of property other than in the ordinary course of business—the purchase of the annuity from Northbrook Life Insurance on April 24, 1996. The Debtors also omitted many other transfers on their SFA and schedules including, but not limited to,[2] the

1. At trial, Peter Lordy testified that the Debtors liquidated this annuity post-petition notwithstanding the fact that the both the Trustee and Wausau objected to the Debtors' claimed exemptions.

2. The Debtors' misrepresentations and omissions, and their required place in the bankruptcy schedules are as follows:

1. Purchase of Spanish Trail Property — SFA–10
2. Sale of Millburn Property — SFA–10
3. Sale of East Avenue Property — SFA–10
4. Sale of East Orange Property — SFA–10
5. Contract for Sale of Club Drive Property — SCH. G
6. Lease of Club Drive Property — SCH. G
7. Rental income for 440 Club Drive — SFA–2
8. Sale of Mercedes — SFA–10
9. Open accounts at Bank of N.Y. — SCH. B–2
10. Closed accounts at Bank of N.Y. — SFA–11
11. Prior address of debtors — SFA–15
12. Furniture sale at East Avenue Property — SFA–10
13. Furniture sale at Millburn Property — SFA–10
14. Charitable gifts of furniture from Millburn Property — SFA–7
15. Household furnishings not listed or valued — SCH. B–4
16. Paintings — SCH. B–5
17. Jewelry — SCH. B–7
18. Disability income — SCH. I
19. Lease of 1995 Montero and $6000 prepayment — SFA–10
20. Sale NYNEX stock — SFA–1O
21. Sale Disney stock — SFA–10
22. Failed to list safety deposit box — SFA–12
23. Savings account at Great Western bank — SCH. B–2 and/or SFA–11
24. Virginia Lordy's interest in Trust — SCH. B–33
25. Insurance Policy — SCH. B–9
26. Charles Schwab account — SCH. B–2
27. Holly Construction — SFA–16, 17 18, 19, 20, 21

transfer to E.J. Kunman, Trustee for Walter F.H. Mattlage Revocable Trust, the seller of the Spanish Trail Property; the transfer of any of the New Jersey real properties; the transfer of the Dreyfus General Municipal Bond Fund shares; the transfer of the Pellam Note; the sale of the Mercedes Benz; and the redemption of stock through Charles Schwab. The Debtors also failed to list the pending contract for sale, the current lease, or rental income received from the Club Drive Property. Overall, the numerous errors and omissions on the Debtors' schedules involve property which is valued in excess of one million dollars. Clearly such errors and omissions are material.

On September 25, 1996, and again on October 8, 1996, the Debtors amended Schedule B of their petition to include, among other things, cash, jewelry and additional annuities from MBL Life Assurance. The Debtors also amended their Statement of Financial Affairs to reflect the sale of the New Jersey assets. However, the Debtors still failed to include the transfer of the proceeds from those sales to E.J. Kunman.

The Court finds that the September 25, 1996, and October 8, 1996, amendments and disclosures were the result of the extensive discovery conducted by the Trustee. The Court further finds that had the Trustee and creditors not extensively questioned the Debtors at their section 341(a) meeting and FRBP 2004 examinations, the Debtors would not have voluntarily amended their SFA or schedules.

In addition, the Court finds that the Debtors failed to furnish the Trustee with numerous bank records and brokerage account records. For example, the Debtors claimed that certain Disney corporation stock not listed on their schedules actually belonged to their son. The Debtors were unable to provide proof of their son's ownership and the evidence showed that the funds used to purchase the stock came from a previously undisclosed account at the Bank of New York.

Furthermore, at trial Virginia Lordy produced certain records which she admitted had not been produced to the Trustee despite the Trustee's discovery requests. She admitted that she had kept these undisclosed records at home.

Virginia Lordy also claimed that she did not know the location of her $20,000 diamond engagement ring and acknowledged that she failed to report it as on the schedules as lost. The Court does not find this testimony credible and believes that Virginia Lordy is concealing this asset from the Trustee and the Debtors' creditors.

### CONCLUSIONS OF LAW

This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151 and 157(a). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(B) and (J).

**1. The Debtors' may not claim Florida exemptions because they were not domiciled in Florida for the greater part of the 180 day period preceding their voluntary petition pursuant to 11 U.S.C. § 522(b)(2)(A).**

The Trustee and Wausau object to the Debtors' claimed Florida exemptions on the grounds that the Debtors were not domiciled of Florida for the majority of the 180 day period preceding their petition date pursuant to 11 U.S.C. § 522(b)(2)(A). Section 522 of the Bankruptcy Code provides, in relevant part:

(b) Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate

. . . .

(2)(A) any property that is exempt under ... state or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has—been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer period of such 180-day period than in any other place. . . .

11 U.S.C. § 522(b)(2)(A). Thus, the Court must determine whether the Debtors were Florida domiciliaries on or before February 8, 1996, the ninety-first day prior to their petition date of May 9, 1996. *In re Ring*, 144 B.R. 446 (Bankr.E.D.Mo.1992). The Debtors' claim that they established their new domicile in Florida on February 1, 1996,

because by that date they had leased the Boca Raton Apartment, obtained voter registration cards, opened a Florida bank account, and Peter Lordy had filed a Declaration of Domicile. By contrast, the Trustee and Wausau maintain that the Debtors did not establish Florida domiciles until April 15, 1996, the day they closed on the Spanish Trail Property.

A person's domicile is established "by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." *In re Hodgson,* 167 B.R. 945, 950 (D.Kan.1994) *citing Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 48, 109 S.Ct. 1597, 1608, 104 L.Ed.2d 29 (1989). A person has only one domicile at a particular time even though he or she may have several residences. *Id.* A change in domicile requires physical presence at the new location along with an intention to remain there indefinitely or the absence of any intention to go elsewhere. *In re Ring,* 144 B.R. at 449 *citing Holmes v. Sopuch,* 639 F.2d 431, 433 (8th Cir.1981). When determining whether a person has established a new domicile, a court must evaluate all relevant facts and circumstances because no single factor can conclusively establish domicile. *Ring* at 450; *Hodgson* at 950–51.

As indicated above, the Court must determine whether the Debtors were Florida domiciliaries at least 91 days prior to their petition date. This date is February 8, 1996. Thus, the inquiry for the Court is whether the Debtors established Florida domiciles before February 8, 1996.

In *District of Columbia v. Murphy,* the United States Supreme Court discussed several factors a court should consider when determining a person's domicile. These factors include current residence; voting registration and practices; location of spouse and family; location of personal and real property; location of brokerage and bank accounts; memberships in churches, clubs, and other organizations; location of the person's doctors, dentist, accountant and lawyers; place of employment or business; driver's license and automobile registration; and payment of taxes. All of these factors are evidence of the intent to establish a domicile in a particu-

lar location. 314 U.S. 441, 455–58, 62 S.Ct. 303, 309–11, 86 L.Ed. 329 (1941). According to the Supreme Court:

> "One's testimony with regard to his intention is of course to be given full and fair consideration, but is subject to the infirmity of any self-serving declaration, and may frequently lack persuasiveness or even be contradicted or negatived by other declarations and inconsistent acts."

*Id.*

If this Court considers the factors enumerated by the Supreme Court in *Murphy,* then it is apparent that the Debtors did not intend to establish their domicile in Florida prior to February 8, 1996. Notwithstanding Peter Lordy's self-serving Declaration of Domicile and the other perfunctory and ministerial steps taken by the Debtors, the Court finds that the Debtors were domiciled in New Jersey prior to and on February 8, 1996. First, most the Debtors' transfers of real property prior to the petition date reflect a New Jersey, rather than a Florida, address for the Debtors. For example, the contracts for the sale of the Millburn Property, dated February 8, 1996, and the February 9, 1996, contract for the sale of the East Avenue Property show the Debtors' address as the Millburn Property. The February 1996 contract for the purchase of the Spanish Trail Property also shows the Debtor's address as the Millburn Property. The February 27, 1996, contract for the sale of the Club Drive Property shows that property as the Debtors' address while the deed transferring title to that property, dated March 15, 1996, shows the Debtors as residing at the Millburn Property. The HUD–1 settlement statement prepared on April 15, 1996, in connection with the purchase of the Spanish Trial Property, shows the Debtors' address as 175 Quincy Court, Hopelawn, New Jersey, rather than the Boca Raton Apartment address reflected on Peter Lordy's Declaration of Domicile. However, most persuasive to this Court is fact that the Debtors' did not ship their personal belongings to Florida until March 22, 1996, and the items were immediately placed in storage upon reaching Florida.

In addition to the real property transfers, other evidence shows the Debtors did not intend to change their domicile to Florida prior to February 8, 1996. For example, the Debtors' personal banking statements from the Bank of New York for the period January 18, 1996, through March 15, 1996, show the Debtors' address as the Millburn Property. Moreover, the check clearing, deposit and withdrawal activity for this account clearly indicates this was the Debtors' primary bank. In addition, a check from Charles Schwab, dated February 13, 1996; credit card statements for the period January 19, 1996, through March 20, 1996; an account statement from the Dreyfus General Municipal Bond Fund for the period January 1, 1996, through March 29, 1996; Prudential IRA account statements through March 31, 1996; and an annuity statement from MFS/Sun Life of Canada (U.S.) dated April 24, 1996, show the Debtors' address as the Millburn Property. Thus, it is clear to this Court that other than Peter Lordy's Declaration of Domicile the Debtors' did not take any steps toward informing their creditors, banks, and others that they had relocated to Florida until sometime in April of 1996.

The Debtors' also spent little time in Florida prior to their voluntary petition and even less time in Florida prior to February 8, 1996. Peter Lordy spent approximately 72 days of the 180 days preceding the Debtors' petition date in Florida, while Virginia Lordy, spent approximately 41 days in Florida. During their limited time in Florida, the Debtors' did not join any churches, clubs, unions and other organizations nor did the Debtors establish relationships with local professionals other than their current bankruptcy attorney. Peter Lordy testified that both his psychologist and psychiatrist were located in New Jersey; the Debtors' attorney, Timothy Neumann, Esquire, was located in New Jersey; and the Debtors' accountant was located in New York.

The Court finds it particularly significant that as of March 22, 1996, the Debtors' business, their place of employment, and their employer, Direct, were located in New Jersey. Peter Lordy testified that he was last employed by Direct in March of 1996. Furthermore, as late as April 12, 1996, Virginia Lordy was still employed by and received payroll checks from Direct. The Court finds it incredulous that the Debtors' would assert that they were domiciled in Florida while they were working for and receiving pay checks from their New Jersey company and employer which was, at that time, operating under Chapter 11.

In addition, Peter Lordy's Declaration of Domicile stated that the Boca Raton Apartment was his predominant and principal home even though the it was leased on a month to month basis, the Debtors owned and resided at several other residences, the evidence showed that the Debtors rarely stayed at the Boca Raton Apartment during the term of the lease, and the Debtors' had already entered into the contract to purchase the Spanish Trail Property. Finally, the Debtors did not obtain Florida Drivers Licenses until March 1, 1996.

Based upon the foregoing, this Court holds that the Debtors did not possess the requisite intent to be domiciled in Florida prior to February 8, 1996. Therefore, the Debtors' are entitled to claim any exemptions available to debtors domiciled in New Jersey. *In re Johnson*, 184 B.R. 141 (Bankr.D.Wyo. 1995). The state of New Jersey has not opted out of the federal exemptions scheme and, consequently, the Debtors may only claim property as exempt in accordance with section 522(d) of the Bankruptcy Code.

**2. The Debtors' transferred and attempted to transfer assets with the intent to hinder, delay, and defraud creditors.**

The Trustee and Wausau argue that the Debtors should be denied a discharge pursuant to 11 U.S.C. § 727(a)(3) because they transferred assets with the intent to hinder, delay, and defraud Wausau. Section 727(a)(2) of the Bankruptcy Code provides:

The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has

permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(A) & (B). The Plaintiffs bear the burden of proving that the Debtors are not entitled to receive a discharge. Fed.R.Bankr.P. 4005. A creditor need only establish that a debtor committed such acts by a preponderance of the evidence. Because the terms hinder, delay, or defraud are stated in the alternative, a creditor need not establish that it was ultimately defrauded for a court to deny the debtor's discharge. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

 The intent to hinder, delay or defraud can be inferred from extrinsic evidence. *In re Allen,* 203 B.R. 786 (Bankr. M.D.Fla.1996); *In re Mackey,* 158 B.R. 509, 512 (Bankr.M.D.Fla.1993); *In re Elliott,* 79 B.R. 944, 946 (Bankr.M.D.Fla.1987). The reason for such an inference is because a debtor is unlikely to testify that he or she possessed the requisite intent to commit wrongdoing. Courts generally consider the following "badges of fraud" when deciding whether a debtor had the intent to hinder, delay or defraud: (1) the objecting creditor had a "special equity" in the property converted; (2) the debtor and the transferee maintained a close relationship; (3) the debtor's possession, benefit, or use of the property; (4) the debtor engaged in a "sharp practice" of dealing prior to filing bankruptcy; (5) the debtor became insolvent as a result of the transfers; (6) the conversion occurred after the entry of a judgment; and (7) the debtor received inadequate consideration. *In re Barker,* 168 B.R. 773, 777 (Bankr. M.D.Fla.1994) *citing In re Oberst,* 91 B.R. 97, 101 (Bankr.C.D.Cal.1988).

 In addition to these "badges of fraud," the conversion of nonexempt assets to exempt assets can be evidence of intent to hinder, delay or defraud. Two factors in determining such intent are the timing of the conversion to exempt property and any attempts by the debtor to conceal the conversion. *In re Wilbur,* 206 B.R. 1002 (Bankr. M.D.Fla.1997); *In re Allen,* 203 B.R. at 792; *Mackey,* 158 B.R. at 512; *Elliott,* 79 B.R. at 946.

 In the instant case, the Court finds that most, if not all, of the asset transfers establish that the Debtors intended to hinder, delay or defraud Wausau and their other creditors. It is clear that the Debtors were well aware of their potential need for bankruptcy protection as early as December 13, 1995—the day they filed their adversary proceeding in Direct's bankruptcy case seeking to extend the automatic stay to themselves. In addition, Peter Lordy testified that he first consulted with a bankruptcy attorney in January of 1996. It was at this time that the Debtors began to transfer assets out of the reach of creditors, by attempting to convert non-exempt assets into exempt assets.

The Court finds that the Debtors made the majority of the transfers to take advantage of Florida's, rather than New Jersey's, exemptions. On January 9, 1996, six days after the New Jersey Bankruptcy Court denied their request to extend Direct's automatic stay, the Debtors listed two of their real properties for sale and accepted offers on the properties less than three weeks later with little or no negotiation as to price. The Court finds the fact that the properties were sold for less than their fair market value is indicative of the Debtors' intent to hinder, delay and defraud. For example, the East Avenue Property was sold for $705,000.00 even though the most recent tax appraised value of the property was $914,700.00 and the Debtors' March 31, 1994, Financial Statement submitted to Wausau showed a value of $1,400,000.00. The Debtors' also sold the Pellam Note for $170,000 despite its value of $215,431—a 21% discount. Furthermore, despite their knowledge of the Temporary Restraining Order, the Debtors attempted to transfer the Club Drive Property and prepaid their son's college tuition of $22,000 for the 1996–1997 school year.

The Debtors' petitions and schedules also evidence an intent to conceal transfers. On their original SFA, the only transfer listed by the Debtors as one made in the ordinary

course of business was the purchase of the Northbrook Life Insurance. The Debtors did not list the transfers of the real properties, the Dreyfus General Municipal Bond fund share, the transfer of the Pellam Note, the transfer of their Mercedes Benz, the transfer of the cash used to purchase the Spanish Trail Property, or the redemption of stock through Charles Schwab. As discussed above, the Debtors finally amended their schedules in October of 1996 after extensive discovery by the Trustee. The Court finds that amendments were not made voluntarily and, moreover, the Debtors' amended SFA and schedules still failed to list the purchase of the Spanish Trail Property, the redemption of certain stock and mutual fund shares, the contract for the sale of the Club Drive Property, and the lease on the Club Drive Property. The Debtors' failure to appropriately amend their SFA and schedules is strong evidence of their fraudulent intent.

The Debtors also attempted to conceal their transfer of assets from the New Jersey District Court. In Peter Lordy's May 7, 1996, certification, filed two days before the Debtors' petition date, he certified that the Debtors "are still in possession of the proceeds of the sales of real estate." By that time he had prepaid the tuition to Curry College.

Virginia Lordy's testimony further supports this Court's conclusion that the assets were transferred with the intent to hinder, delay, and defraud Wausau. In her direct testimony Virginia Lordy stated, "Personally, they [Wausau] have caused me severe pain and anguish while we are doing what we can to preserve our assets legally." When questioned by the Trustee's counsel regarding what this statement meant, Virginia Lordy stated that she "really don't know" and that the Debtors were trying "to do the right thing our, to preserve our assets." When questioned by this Court regarding what she meant by the word "preserve," Virginia Lordy testified that it meant "keep." She could not answer, however, whether the Debtors were trying to "keep from someone."

The Debtors also admit that they transferred assets after they filed their voluntary petition in violation of section 727(a)(2)(B) of the Bankruptcy Code. Peter Lordy testified on direct examination that "[a]fter June 17, 1996, we were forced to liquidate my wife's IRA at Prudential Securities to live on until my disability insurance payments were received." The Debtors made this transfer despite the fact that the Trustee's Objection was pending and the asset was property of the estate property and belonged to the Trustee. In addition, the Debtors never volunteered this information to the Trustee at the Rule 2004 examination and did not amend their schedules to reflect the liquidation.

Finally, each of the conversions and transfers occurred after the Debtors' were in default of their obligations to Wausau, after their company, Direct, filed bankruptcy, and after the New Jersey Bankruptcy Court refused to extend Direct's automatic stay to the Debtors. Under the circumstances, this Court finds that the Debtors acted with the intent to hinder, delay and defraud their creditors. Accordingly, the Court holds that Debtors discharge is denied pursuant to 11 U.S.C. § 727(a)(2)(A).

**3. The Debtors concealed and failed to preserve books, records, and other documents from the Trustee.**

The Trustee further seeks denial of the Debtors' discharge pursuant to 11 U.S.C. § 727(a)(3). According to this section of the Bankruptcy Code, a debtor will be denied a discharge if

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transaction might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3). "The purpose of this provision is to ensure that the trustee and creditors receive sufficient information to trace a debtor's financial history for a reasonable period past to present." *In re Trogdon*, 111 B.R. 655, 658 (Bankr.N.D.Ohio 1990). In the instant case, the Court finds that the Debtors failed to supply the Trustee

with complete records regarding their financial condition. It was only through the diligent efforts of the Trustee and Wausau, who were required to subpoena and request records from third parties, that the Trustee was able to obtain any substantial information about the Debtors' financial condition.

Specifically, the Debtors did not provide the Trustee with records for their Great Western Savings account or any bank records for their 11 accounts at the Bank of New York. Furthermore, at trial, Virginia Lordy produced some records from the Bank of New York she had kept at home and admitted that she had not produced them to the Trustee. The Debtors also purchased stock in the Disney corporation but claimed that it belonging to their son. However, the Debtors were unable to produce any documentation to support their contention and the evidence at trial showed that the funds used to purchase the stock came from yet another undisclosed account at the Bank of New York. In addition, the Debtors failed to cure several other omissions by subsequent amendments to their SFA and schedules. Finally, the Debtors failed to produce any documentation or any evidence to explain the disposition of approximately $57,000 in cash and assets. Accordingly, the Court holds that the Debtors' discharge is denied pursuant to 11 U.S.C. § 727(a)(3). *In re Chalik*, 748 F.2d 616 (11th Cir.1984); *Vetri v. Meadowbrook Mall Company*, 174 B.R. 143 (M.D.Fla.1994).

## 4. The Debtors knowingly and fraudulently made false oaths and accounts.

The Trustee further objects to the Debtors discharge pursuant to 11 U.S.C. § 727(a)(4) which provides that a court shall grant a debtor a discharge unless "the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account." A knowing and fraudulent omission from a sworn Statement of Financial Affairs or schedules may constitute a false oath sufficient to bar a debtors discharge. The Eleventh Circuit has stated:

> The subject matter of a false oath is "material" and thus, sufficient to bar discharge, if it bears a relationship to the

bankrupt's business transactions or estate, or concerns a discovery of assets, business dealings or the existence or disposition of his property.

*In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984). "Deliberate omissions by the debtor may also result in the denial of discharge." *Id.* In addition, detriment to a creditor need not be shown. *Id.* Furthermore, "[a]lthough a single omission is generally insufficient to support an objection to discharge, a series of omissions may create a pattern which demonstrate the Debtor's reckless disregard for the truth, and fraudulent intent may be presumed from that pattern of behavior." *In re Phillips*, 187 B.R. 363, 370 (Bankr.M.D.Fla.1995). The Trustee bears the burden of proving that the Debtors omissions were material. Fed.R.Bankr.P. 4005.

In the instant case, it is not a question of whether the Debtors failed to list some minor asset on their schedules. The evidence presented clearly shows that the Debtors' schedules contained numerous errors and omissions with regard to properties valued in excess of one million dollars. Specifically, the Court finds the following items particularly significant.

### a. The Spanish Trail Property

On April 15, 1997, approximately three weeks before their petition date, the Debtors closed on the Spanish Trail Property in Boca Raton, Florida. The deed transferring title was recorded on April 18, 1996. The testimony and evidence at trial showed that at the time of closing the sum of approximately $578,000.00 was transferred to E.J. Kunman, the seller of the property. Despite the fact that question 10 on the Statement of Financial Affairs requires a debtor to list all transfers within one year of the filing of the bankruptcy petition, the Debtors did not list this transaction.

### b. The Millburn Property

Approximately five weeks prior to the Debtors' petition date, on March 25, 1996, the Debtors sold the Millburn Property. This property had been the Debtors' home for over twenty years. The Millburn Property was listed for sale by the Debtors only six

days after the New Jersey Bankruptcy Court denied their request to extend Direct's automatic stay. The Debtors netted approximately $152,000.00 from the sale of the property. The sale of this property was not listed in response question 10 on the Statement of Financial Affairs.

At their § 341 meeting on June 19, 1996, the Trustee inquired as to the disposition of various properties. Each of the Debtors was also questioned at their respective depositions, on August 21, 1996, regarding the properties. Subsequent thereto, on September 25, 1996, the Debtors amended their bankruptcy schedules to include this transfer. While subsequent voluntary disclosures may be considered evidence of an innocent omission, *In re Glickman*, 64 B.R. 616 (Bankr.S.D.Fla.1986), the Court finds that the Debtors did not come forward with this information until specifically questioned by the Trustee and the creditors. Moreover, the Court finds the amendments to the bankruptcy schedules were not made until after substantial discovery was undertaken by the Trustee and Wausau. The Court further notes that although the Debtors did come forth to amend their schedules after discovery to list several of the assets discovered, the Debtors still did not amend their schedules completely. It is a debtor's duty to voluntarily disclose this information and provide complete and accurate bankruptcy schedules. *In re Muscatell*, 113 B.R. 72 (Bankr.M.D.Fla.1990).

#### c. The East Avenue Property, the East Orange Property and the Pellam Note.

The East Avenue Property was also placed on the market for sale at the same time as the Millburn Property. As discussed above, Peter Lordy testified that he wanted realtor to "move the property." Although the property was sold for almost $200,000 less than its taxed assessed value, the Debtors netted in excess of $440,000 from its sale. This transfer was also omitted from the Debtors' Statement of Financial Affairs.

The Debtors also failed to list the Pellam Note and the stream of income they received from mortgage payments on the East Orange Property. As discussed above, the Debtors accepted the sum of $170,000 in satisfaction of the mortgage on the East Orange Property although the outstanding balance was $215,000. The Debtors' September amendments listed the transfer of the interest in the mortgage, however, the Debtors did not list the fact that they had discounted the mortgage and never amended their schedules to indicate the income received from the mortgage.

#### d. The Club Drive Property

At the time of the filing of their petition, the Debtors still owned the Club Drive Property. In this instance the Debtors listed the property on their bankruptcy schedules, however, they failed to show that a contract for the sale of the property was pending. At no time did the Debtors amend their schedules to indicate that the pending contract existed. The Debtors also failed to list any rental income that they received from this property.

#### e. The sale of the Mercedes Benz

The Debtors further failed to list the sale of their Mercedes Benz automobile for $25,000. The sale occurred less than 90 days prior to their petition date.

#### f. Accounts at the Bank of New York

As indicated above, the Debtors also failed to list 11 separate bank accounts at the Bank of New York as required by question 11 on the Statement of Financial Affairs. The Trustee, as part of his initial investigation, requested production of all the checks upon which either of the Debtors had signatory authority for the last three years. The Debtors did not produce any checks from the Bank of New York. After going forward with his investigation, the Trustee discovered that within one year preceding the filing of their petition, the Debtors actually had eleven bank accounts at the Bank of New York. Subsequent to the Trustee discovering the existence of those accounts, the Debtors amended their schedules to list only one open account at the Bank of New York as opposed to the 11 that actually existed. The Debtors claimed that the accounts were not listed because they believed they had been closed.

However, the Debtors did not show the accounts as closed accounts on their Statement of Financial Affairs. Furthermore, the evidence showed that there was substantial activity within the accounts until shortly before the petition date.

### g. Jewelry

The Debtors, at the time of filing their bankruptcy petition, owned jewelry which included a 2 carat diamond ring with an estimated value of $20,000.00 and a wedding ring with an estimated value of $2,000.00. The Debtors failed to list this jewelry on their bankruptcy schedules. In response to Question 7, Schedule B, which specifically asks the Debtors to list all furs and jewelry, the Debtors typed in the word "none" and the value "0". After the Trustee questioned the Debtors at the § 341 meeting and the 2004 Examinations, the Debtors amended their schedules to include the diamond engagement ring and the wedding ring. When the Trustee asked the Debtors to turn over the jewelry to him, the Debtors claimed that the jewelry had been lost. The Court notes that the subsequent amendment by the Debtors listed the jewelry in response to Schedule B, question 7 as property currently in the possession of the Debtors. If the items were truly lost, then they should have been listed in response to question 8 on their Statement of Financial Affairs. As indicated above, the Court believes that Virginia Lordy is concealing the assets from the Trustee and her creditors.

### h. Great Western Savings Account

A few months prior to the filing of their petition, the Debtors had a savings account at Great Western Bank. The account was not listed in response to question 2 on Schedule B as an open account nor was it listed in response to question 11 of the Statement of Financial Affairs as a closed account. At trial, the evidence before the Court showed that within approximately 3 months prior to the petition, there was over $800,000 in the account. It appears that some of the money was used to purchase the Spanish Trail Property and the annuity. Neither transfer was listed on the schedules or Statement of Financial Affairs.

### i. Disability Income

At the time the Debtors filed their petition, a claim had been filed under their disability insurance. The Debtors expected to receive disability income upon approval of the claim. Schedule I requires a debtor to list all income and/or expected changes in income in the upcoming 12 months. The Debtors did not list this disability insurance policy nor was it added by any subsequent amendments. The policy initially paid the Debtors $10,000 per month, but was then reduced to $7,000 per month.

### j. Household furnishings

The Court further notes that the Debtors failed to list the sale of household furnishings from their New Jersey residences. The Trustee requested that the Debtors provide a list of all items sold but the Debtors failed to comply with his request and failed to list the sales on their schedules. Moreover, at trial, Virginia Lordy was specifically questioned about the sale of the furnishings from the Millburn Property. At first she denied that any furniture was sold. However, after her testimony was impeached, she then stated that some of the furnishings had been sold.

The Court notes that the misrepresentations and omissions listed above are merely examples. The law is clear that where a debtor fails to correct numerous significant and material omissions in the schedules and statement of financial affairs, and those omissions combine to prevent identification and marshalling and liquidation of estate assets, the debtor's discharge should be denied. *In re Chalik; In re Phillips.* It is clear to the Court that the Debtors knowingly and fraudulently made false oaths and accounts in an attempt to deceive their creditors and the Trustee. Furthermore, the Debtors' amendments were insufficient to remove the taint of fraudulent intent and reflect a pattern of concealment and reckless disregard for the truth. *In re Trauger,* 101 B.R. 378, 382 (Bankr.S.D.Fla.1989). Accordingly, this Court holds that Debtors shall be denied a discharge pursuant to 11 U.S.C. § 727(a)(4).

**5. The Debtors have failed to satisfactorily explain the loss or deficiency of assets.**

 The Trustee also seeks to deny the Debtors their discharge pursuant to 11 U.S.C. § 727(a)(5). Section 727(a)(5) of the Bankruptcy Code provides as follows:

(a) the court shall grant the debtor a discharge, unless—

. . . .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

11 U.S.C. § 727(a)(5). The Trustee has the initial burden of proving his objection to the Debtors' discharge. *In re Hawley*, 51 F.3d 246 (11th Cir.1995). The Court finds that in this case the Trustee has sustained his burden by proving many discrepancies between the Debtors' various Statements of Financial Affairs and schedules and the assets subsequently discovered by the Trustee.

 Once the Trustee establishes a basis for his objection, the burden then shifts to the Debtors to explain the loss. *Id.* at 249. The explanation given by the Debtors must be satisfactory to the Court and the Debtors are "required to produce some kind of direct, specific evidence in order to defeat an objection based upon failure to explain a loss of assets." *Id.; In re MacPherson*, 129 B.R. 259, 261 (M.D.Fla.1991). The Court finds that the Debtors cannot meet their burden. The following are examples of withdrawals and redemptions made by the Debtors during the seven months preceding their petition date for which the Debtors cannot account.

| DATE | WITHDRAWAL/REDEMPTION |
|---|---|
| November 24, 1995 | Peter Lordy withdraws $7,500 from debtors joint account at the Bank of New York (account # 6162072836). |
| December 6, 1995 | Virginia Lordy writes a check made payable to Charles Schwab in the amount of $6,255. The check is drawn on the debtors joint account at the Bank of New York (account # 610–2136819—check # 1115). |
| January 5, 1996 | Virginia Lordy withdraws $10,000 from the debtors joint priority savings account at the Bank of New York (account # 616–2136819). |
| January 16, 1996 | Virginia Lordy redeems $15,000 worth of shares held in the Dreyfus General Municipal Bond fund (account # 106–0286036781). |
| January 29, 1996 | Virginia Lordy withdraws $6,000 from the debtors joint savings account at the Bank of New York (account # 616–2072836). |
| February 13, 1996 | Debtors redeem stock through Charles Schwab and receive a check in the amount of $19,918. |
| February 22, 1996 | Debtors withdraw $1,704.90 from their joint account at the Bank of New York (account # 616–2071926). |
| February 26, 1996 | Peter Lordy sells a Mercedes Benz automobile for $25,000. |
| February 27, 1996 | Peter Lordy writes a check made payable to himself in the amount of $2,500. The check is drawn from the debtors' joint account at the Great Western Bank. |
| April 1, 1996 | Virginia Lordy writes a check made payable to James Lordy in the amount of $1,704.90. The check is drawn on the debtors' joint account at the Bank of New York. |
| April 10, 1996 | Peter Lordy writes a check made payable to Ginger Lordy in the amount of $1,750. |

These withdrawals and/or redemptions represent $97,332.80. If this Court resolves all doubts in favor of the Debtors and recognizes that they turned $40,000.00 over to the Trustee, then there is approximately $57,-000.00 for which the Debtors cannot account. At trial the only explanation given by the Debtors was that the funds were used for living expenses. However, they could not present any documentation was presented to support this contention. "Vague and indefinite explanations of losses that are based on estimates uncorroborated by documentation are unsatisfactory." *Hawley*, 51 F.3d at 249 citing *In re Chalik*, 748 F.2d at 619; *In re Dupree*, 197 B.R. 928, 938 (Bankr.N.D.Ala. 1996). Accordingly, the Court holds that the Debtors shall be denied a discharge pursuant to 11 U.S.C. § 727(a)(5).

### *CONCLUSION*

Based on the foregoing, the Court finds that the Debtors failed to establish new Flor-

ida domiciles prior to February 8, 1996. Because New Jersey has not opted out of the federal exemption scheme, the Debtors may only claim property as exempt in accordance with 11 U.S.C. § 522(d).

The Court further finds that the Debtors clearly engaged in a pattern of activity with the intent to hinder, delay, and defraud their creditors. The Debtors concealed and failed to preserve adequate documentation in furtherance of their goal and could not satisfactorily explain any loss or deficiency of assets. Accordingly, the Debtors shall be denied a discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A), (a)(3), (a)(4), and (a)(5). A Final Judgment shall be entered in conformity with Fed.R.Bankr.P. 9021.

### ORDER

Based upon the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. The objections to the Debtors' claimed exemptions are sustained and the Debtors shall have ten (10) days from the date of this Order to file amended exemptions.

2. The Debtors discharge is denied pursuant to 11 U.S.C. §§ 727(a)(2)(A), (a)(3), (a)(4), and (a)(5).

3. A separate Final Judgment in accordance with Fed.R.Bankr.P. 9021 shall be entered contemporaneously herewith.

### FINAL JUDGMENT

**THIS MATTER** came before the Court upon the Complaints of the Chapter 7 Trustee, Robert C. Furr (the "Trustee"), and Employers Insurance of Wausau, a Mutual Company ("Wausau") objecting to the Debtors', Peter C. and Virginia M. Lordy (the "Debt-

ors"), claimed exemptions based upon the Debtors' failure to establish their domicile in Florida for the greater part of 180 days immediately preceding their voluntary petition pursuant to 11 U.S.C. § 522(b)(2)(A). The Trustee and Wausau further object to the Debtors' receiving a discharge pursuant to section 727(a)(2)(A) of the Bankruptcy Code. In addition, the Trustee objects to the Debtors' receiving a discharge pursuant to sections 727(a)(3), (4), and (5) of the Bankruptcy Code. The adversary proceedings were consolidated for trial and a two day trial was held on February 27 & 28, 1997. The Court, having heard the testimony and observed the demeanor of the witnesses, observed and examined the evidence presented, having heard the arguments of counsel, being otherwise fully advised in the premises, and contemporaneously with it Findings of Fact and Conclusions of Law hereby enters the following Final Judgment.

It is **ORDERED AND ADJUDGED** as follows:

1. The objections to the Debtors' claimed exemptions are sustained and the Debtors shall have ten (10) days from the of this Order to file amended exemptions.

2. The Debtors discharge is denied pursuant to 11 U.S.C. §§ 727(a)(2)(A), (a)(3), (a)(4), and (a)(5).

DONE AND ORDERED.