**In re Thomas W. LEFFINGWELL et ux., Debtors.**

**The Cadle Company, Plaintiff,**

v.

**Thomas W. Leffingwell et ux., Defendants.**

**Bankruptcy No. 00–3299–8C7. Adversary No. 00–00467.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

May 14, 2002.

Jeffrey W. Leasure, Ft. Myers, FL, for debtors.

Kathleen W. Adams, Estero, FL, for plaintiff.

Traci K. Strickland, St. Petersburg, FL, trustee.

Angela Stathopoulos, Tampa, FL, for trustee.

## MEMORANDUM OF DECISION

C. TIMOTHY CORCORAN, III,
Bankruptcy Judge.

This adversary proceeding came on for a two-day trial beginning on October 29, 2001, of the plaintiff's complaint to deny the debtors' discharge pursuant to Section 727(a)(3), (a)(4)(A) and (a)(5) of the Bankruptcy Code. At the conclusion of the trial, the court requested that the parties file post-trial submissions. On December 17, 2001, the defendants filed proposed findings of fact and conclusions of law (Document No. 55). On December 19, 2001, the plaintiff filed proposed findings of fact and conclusions of law (Document No. 56). On December 31, 2001, each party filed its reply to the opposing party's proposed findings of fact and conclusions of law (Document Nos. 57 and 58).

After considering all of the testimony, particularly the demeanor and credibility of the witnesses, the exhibits admitted at trial, the pleadings and written arguments of the parties, including the authorities cited by the parties, the court makes the following findings of fact and conclusions of law.

### I.

The court has jurisdiction of the parties and the subject matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and the standing order of reference entered by the district court. This proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b), and the parties have consented to the entry of final orders and judgment by this court subject, of course, to appellate review under 28 U.S.C. § 158.

### II.

This case concerns two financially sophisticated debtors who sought to preserve their luxurious lifestyle and avoid a substantial judgment debt by filing bankruptcy. To effectuate this plan, they consulted a bankruptcy attorney soon after the entry of judgment and thereafter engaged in pre-bankruptcy planning. It is the debtor/defendants' actions taken in connection with the bankruptcy filing itself, however, that are at issue in this proceeding.

In their petition, schedules, and statement of financial affairs, the defendants made countless false statements about where they live, their financial condition, and their property that distorted and obscured the truth about their personal and financial circumstances. The defendant/husband also failed to preserve the defendants' credit card records. On this record, the court is compelled to deny the defendants' discharge.

### III.

#### A. Background.

The defendants are highly educated. The defendant/husband holds a master's

degree in business administration and is a certified public accountant ("CPA") (Document No. 53, Tr. at 221, lines 5–20). In addition to his involvement with various business endeavors, for 32 years he was employed as a commercial airline pilot for TWA (Document No. 53, Tr. at 220, lines 18–21). In the course of his employment with TWA, the defendant/husband spent between 15–20 days each month away from home (Document No. 52, Tr. at 34, lines 10–20) The defendant/husband retired from TWA in October 2000 (Document No. 52, Tr. at 28, lines 9–23).

The defendant/husband also holds a real estate salesman's license (Document No. 53, Tr. at 174, lines 17–18) and has been involved in the sale of at least one property in the past several years (Document No. 52, Tr. at 98, lines 16–24).

The defendant/husband is presently employed at Laurel Center Management ("Laurel Center") as its comptroller and sole employee (Document No. 52, Tr. at 27, lines 9–14). Laurel Center's business is the management of real estate (Plaintiff's Exhibit No. 52). The defendant/husband reports to Dr. Harry Lowell, the sole shareholder of Laurel Center (Document No. 52, Tr. at 55, lines 9–19).

Dr. Lowell is also a beneficiary of two trusts whose assets are comprised of real property holdings, referred to as the "Gladstyx Trust" and the "Six Acre Cape Coral Trust" ("trusts" or "trust properties") (Document No. 53, at 174, lines 4–7). At the time of filing, the combined assets of both trusts had an approximate value of $3 million (Plaintiff's Exhibit No. 8, Document No. 52, at 45, lines 8–11, and at 51, lines 9–18).

The defendant/husband has been the sole trustee of these trusts since 1987 and holds bare legal title to the real property that comprises the assets of the trusts (Plaintiff's Exhibit Nos. 6 and 7, Document No. 53, Tr. at 175–76). The defendant/husband's compensation from Laurel Center includes compensation for his duties as trustee (Document No. 52, Tr. at 48, lines 12–25, and at 49).[1]

The defendant/wife holds a bachelor of science degree and has done some graduate work (Document No. 54, Tr. at 262, lines 6–13). She is now retired but worked for many years teaching English in secondary schools (Document No. 54, Tr. at 262, lines 5–10). The defendants have one son, aged 24 (Plaintiff's Exhibit No. 1, Document No. 53, Tr. at 222, lines 7–8).

During the mid-80's, the defendants were involved in a real estate partnership in St. Louis, Missouri (Document No. 53, Tr. at 222, lines 19–22). The defendant/husband was the general partner, and the defendant/wife was a limited partner of the partnership (Plaintiff's Exhibit No. 15). On August 30, 1996, the Federal Deposit Insurance Corporation obtained a judgment against the defendants, jointly and severally, in the amount of $3,442,621.23, plus post-judgment interest, as a consequence of the real estate partnership's default on a financial obligation (Plaintiff's Exhibit No. 15).

After the entry of judgment, the defendants consulted a bankruptcy attorney. They paid $975 in fees in October of 1997 and October of 1998 (Plaintiff's Exhibit No. 1, Statement of Financial Affairs, Item No. 9).

The Federal Deposit Insurance Corporation assigned the judgment against the defendants to JDC Finance Company which in turn assigned it to The Cadle Company, the plaintiff in this proceeding,

---

1. The court does not credit the defendant/husband's inconsistent testimony on this point

(Document No. 52, Tr. at 48, lines 6–11, and at Document No. 53, Tr. at 176, lines 6–8).

in the spring of 1999 (Claim No. 1 and Defendant's Exhibit No. 2). The plaintiff domesticated the judgment in Florida and served a writ of execution on both defendants in November 1999 (Document No. 52, Tr. at 68, lines 16–18, and Document No. 53, Tr. at 214, lines 21–24).

Around this time, the defendants began a series of actions designed to position themselves to advantage in a bankruptcy case. For example, they closed a brokerage account and liquidated TWA stock (Plaintiff's Exhibit No. 1, Statement of Financial Affairs, Item Nos. 10 and 11).

In January 2000, the plaintiff garnished the defendants' principal checking account located at SouthTrust Bank (Document No. 53, Tr. at 223, lines 1–8). The plaintiff subsequently released its garnishment because the account was a wage account (Plaintiff's Exhibit No. 1, Statement of Financial Affairs, Item No. 4b). To avoid further garnishment, the defendants closed their SouthTrust account and opened a joint checking account at Fifth Third Bank (Plaintiff's Exhibit No. 30, Document No. 52, Tr. at page 91, lines 9–20).

The defendant/husband also exhausted the monies remaining in a checking account at First Union National Bank, in the amount of $13,500, in an attempt to avoid garnishment of those monies (Document No. 53, Tr. at 224, lines 5–15). Some of that money went to pay down credit card debt and for home remodeling projects (Plaintiff's Exhibit No. 5). The wife was aware of these payments (Document No. 53, Tr. at page 202, lines 16–25, at 203, lines 1–22, and at 204, lines 6–24).

In February 2000, the defendants again consulted a bankruptcy attorney, making an additional payment of $600 (Plaintiff's Exhibit No. 1, Statement of Financial Affairs, Item No. 9). In that same month, the defendant/husband traded in his unencumbered 1986 Mercedes on a leased 2000 Mercedes Benz SL 420 with monthly payments in the amount of $695 (Plaintiff's Exhibit No. 2, Document No. 52, Tr. at page 90, lines 9–12).

B. *The Bankruptcy Filing.*

On March 6, 2000, the defendants filed a joint bankruptcy petition under Chapter 7 of the Bankruptcy Code (Plaintiff's Exhibit No. 1). They filed the case in the Tampa Division of this court. In their petition, the defendants listed the defendant/husband's address as 4400 West Cypress, Tampa, Florida, in Hillsborough County, and the defendant/wife's address as 15930 St. Charles Harbor, Fort Myers, Florida, in Lee County. The defendants listed their marital status as "married/separated" (Plaintiff's Exhibit No. 1, Schedule I).

On the face of the petition and schedules, the defendants appear to be insolvent and without assets to satisfy the claims of their creditors (Plaintiff's Exhibit No. 1). According to the defendants' schedules, their combined monthly net income of $6,997 is inadequate to pay their combined monthly expenses of $7,914, leaving a monthly shortfall in the amount of $917 (Plaintiff's Exhibit No. 1, Schedules I and J).

The defendants scheduled only two debts, the unsecured debt owed to the plaintiff and one other unsecured debt to Wells Fargo arising from a judgment in the amount of $399,013.12 (Plaintiff's Exhibit No. 1, Schedule F). The defendants did not schedule any secured or priority debts (Plaintiff's Exhibit No. 1, Schedules D and E).

Both defendants signed a declaration under penalty of perjury as to the truth and correctness of the petition and schedules (Plaintiff's Exhibit No. 1, Declaration Concerning Debtor's Schedules). Before signing the declaration, each defendant re-

viewed the petition and schedules (Document No. 52, Tr. at 29, lines 6–15 and Document No. 53, Tr. at 189, lines 9–22).

On April 5, 2000, the Chapter 7 trustee conducted a meeting of creditors as required by Section 341 of the Bankruptcy Code. On the same date, she filed a report of no distribution (Main Case Document No. 5). The trustee subsequently filed a notice of withdrawal of the report of no distribution (Main Case Document No. 21) and a report of assets (Main Case Document No. 22). In her most recent interim report, the trustee lists potential assets in the amount of $31,000 arising out of an income tax refund and potential preferential or fraudulent transfers (Main Case Document No. 41).

On July 31, 2000, the plaintiff filed this adversary proceeding pursuant to Section 727 of the Bankruptcy Code seeking to deny the defendants a discharge.

### IV.

■ Section 727 of the Bankruptcy Code provides that the court shall grant a discharge unless the debtor has engaged in specifically enumerated actions that warrant the denial of the discharge. "The statute is to be construed liberally in favor of the debtor and strictly against the objector." *Second National Bank v. Parker (In re Parker)*, 85 B.R. 384, 387 (Bankr. E.D.Va.1988).

In *Hatton v. Spencer (In re Hatton)*, 204 B.R. 477, 482 (E.D.Va.1997), the court described the tension that exists in Section 727 as follows:

The discharge statute, by its very nature, invokes competing considerations. One of the foremost purposes of the bankruptcy act is to "relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from" his former obligations. On the other hand, the "solicitude of

Congress … stops at the debtor who does not measure up to that appealing image" of the "honest but unfortunate debtor." The purpose of a Section 727 … inquiry is to prohibit a discharge "for those who play fast and loose with their assets or with the reality of their affairs." The statute maintains the integrity of the bankruptcy process by insuring that neither the trustee nor the creditors needs "to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight."

*Id.*

The plaintiff asserts that both defendants should be denied a discharge on the basis of Section 727(a)(4)(A), (a)(3), and (a)(5). The plaintiff is a creditor of the defendants and thus has standing to seek a denial of their discharge. *In re Vahlsing*, 829 F.2d 565, 567 (5th Cir.1987).

### A. *Section 727(a)(4)(A)*.

■ "This section is intended to ensure 'that adequate information is available to those interested in the administration of the bankruptcy estate without the need of examinations or investigations to determine whether the information is true.'" *Painewebber Inc. v. Gollomp (In re Gollomp)*, 198 B.R. 433, 437 (S.D.N.Y.1996). "Bankruptcy [t]rustees lack the time and resources to play detective and uncover all the assets and transactions of their debtors." *Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 231 (E.D.N.Y. 2000).

The bankruptcy trustee, therefore, must have "ready access to information regarding a debtor's financial situation in order to determine how best to proceed with the administration of the case." *Henkel v. Green (In re Green)*, 268 B.R. 628, 646 (Bankr.M.D.Fla.2001). The trustee needs

this information at the beginning of the case. *Id.*

■ "A debtor is entitled to discharge so long as the debtor has not engaged in fraudulent activity in disclosing his or her financial condition to the Court." *Williamson Construction, Inc. v. Ross (In re Ross)*, 217 B.R. 319, 323 (Bankr.M.D.Fla. 1998). Thus, the "most important issue in determining the denial of a discharge is 'whether or not the debtor has accurately and truthfully presented himself before the Court.'" *Youngblood v. Hembree (In re Hembree)*, 186 B.R. 530, 533 (Bankr. M.D.Fla.1995), *quoting In re Collins*, 19 B.R. 874, 878 (Bankr.M.D.Fla.1982).

■ Section 727(a)(4)(A) provides that the discharge shall be denied where the debtor: 1) knowingly and fraudulently; 2) makes a false oath or account in connection with the bankruptcy proceeding. *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir.1984). "Deliberate omissions by the debtor may also result in the denial of the discharge." *Id.; Green*, 268 B.R. at 647; *Hembree*, 186 B.R. at 532. A false oath may involve a false statement or omission in the debtor's petition or bankruptcy schedules. *Fogal Legware of Switzerland, Inc. v. Wills (In re Wills)*, 243 B.R. 58, 62 (9th Cir. BAP 1999).

■ In addition, the plaintiff must establish that the false oaths or omissions are material in nature. *Chalik*, 748 F.2d at 618.

■ The plaintiff need not establish the debtor's motive. *Id.* "It makes no difference that [the debtor] does not intend to injure his creditors when he makes a false statement. Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them." *Id.* The relevant inquiry is therefore whether and in what circumstances the debtors made false oaths or omissions rather than the debtors' motivation in making the false oaths or omissions.

■ The plaintiff must establish each of the necessary elements by a preponderance of the evidence. *Grogan v. Garner* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Haught v. United States*, 242 B.R. 522, 524 (M.D.Fla.1999); *Hembree*, 186 B.R. at 532. "If the plaintiff successfully establishes the basis for the objection, the burden of proof shifts to the debtor." *Hembree*, 186 B.R. at 532–33.

■ The plaintiff contends that the defendants have made false oaths or omissions that support the denial of their discharge under Section 727(a)(4)(A). Specifically, the plaintiff asserts that the defendants:

1. Made a false oath with respect to the address at which the defendant/husband resided during the 180 days preceding the filing of the bankruptcy petition;

2. Misrepresented their income and expenses by

 a. understating the defendant/husband's income in 1999 in their statement of financial affairs;

 b. understating the defendant/husband's income from TWA in Schedule I;

 c. omitting the defendant/husband's earned income from Laurel Center in Schedules B and I;

 d. overstating the defendant/husband's rent expense in Schedule J; and

 e. overstating the defendant/husband's support obligation in Schedule J (or conversely omitting the defendant/wife's income attributable to support in Schedule I);

3. Failed to list or undervalued property of the estate by

 a. omitting trust properties owned by the defendant/husband in Schedule A

(or failing to disclose property held for the benefit of others in the statement of financial affairs);

b. omitting TWA stock owned by the defendant/husband from Schedule B;

c. omitting ownership of a yacht club membership from Schedule B;

d. understating the value of real property in Schedule A; and

e. understating the value of personal property in Schedules B and C;

4. Failed to disclose a gift to their son in their statement of financial affairs; and

5. Failed to disclose payments to creditors made within 90 days preceding the bankruptcy filing in their statement of financial affairs.

The plaintiff alleges that the defendants made these false oaths or omissions to obscure their true financial status and to create the impression of insolvency.

1. *Have the defendants made false oaths or omissions?*

■ "Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact." *Williamson v. Fireman's Fund Insurance Co.*, 828 F.2d 249, 251 (4th Cir.1987). The defendants concede that they made false oaths or omissions with respect to the defendant/husband's rent expense and the defendant/husband's legal interest in the trust properties. The plaintiff has accordingly established that the defendants made these false oaths or omissions. The defendants dispute the plaintiff's remaining allegations. The plaintiff is therefore required to establish these false oaths or omissions.

a. *Defendant/Husband's Residence.*

The defendant/husband listed "4400 West Cypress, Tampa, Florida," in Hillsborough County as the place in which he had resided for the majority of the 180 days preceding the bankruptcy filing—an address that is located within the Tampa division of the Middle District of Florida.[2] The defendant/wife listed her address as "15930 St. Charles Harbor, Ft. Myers, Florida," in Lee County—an address that is located within the Ft. Myers division of the Middle District of Florida.[3] Neither defendant listed a prior address within the two years preceding the bankruptcy filing (Plaintiff's Exhibit No. 1, Statement of Financial Affairs, Item No. 15).

The plaintiff contends that the defendants falsely represented the defendant/husband's domicile to be the Sheraton Suites Hotel, 4400 West Cypress, Tampa (the "Sheraton Suites"), at the time of filing and for the six months preceding. The plaintiff asserts that, during this time period, the defendant/husband in fact resided with his wife at 15930 St. Charles Harbor, Ft. Myers. The plaintiff further contends that the appropriate venue of this case is the Ft. Myers Division of the Middle District of Florida.

The defendants allege that they separated in November 1999, four months preceding the bankruptcy filing, and that, as a consequence of that separation, the defendant/husband relocated his residence to the Sheraton Suites (Document No. 52, Tr. at 34, lines 6–9, and Document No. 53, Tr. at 217, lines 24–25, and at 218, lines 1–2). The defendants assert that the defendant/husband stayed at the Sheraton Suites for the majority of the time that he was not flying for TWA (Document No. 52,

---

**2.** L.B.R. 1071–1(b)(3) provides that Hillsborough County falls within the Tampa Division of this court.

**3.** L.B.R. 1071–1(b)(4) provides that Lee County falls within the Ft. Myers Division of this court.

Tr. at 31, lines 13–24, and Document No. 53, Tr. at 190, lines 10–17). The defendants further allege that they reconciled shortly after the filing of their bankruptcy petition and the defendant/husband thereafter resided with the defendant/wife in Ft. Myers.

"A person has only one domicile at a particular time even though he or she may have several residences." *Furr v. Lordy (In re Lordy)*, 214 B.R. 650, 662 (Bankr.S.D.Fla.1997). "A person's domicile is established 'by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there.'" *Id., quoting In re Ring*, 144 B.R. 446, 449 (Bankr.E.D.Mo.1992). "A change in domicile requires physical presence at the new location along with an intention to remain there indefinitely or the absence of any intention to go elsewhere." *Id.* at 662.

"When determining whether a person has established a new domicile, a court must evaluate all relevant facts and circumstances because no single factor can conclusively establish domicile." *Id.* at 662. In determining domicile the court can consider the following factors: "current residence; voting registration and practices; location of spouse and family; location of brokerage and bank accounts; memberships in churches, clubs, and other organizations; location of the person's doctors, dentist, accountant and lawyers; place of employment or business; driver's license and automobile registration; and payment of taxes." *Id.* [finding debtor's perfunctory and ministerial steps taken to establish Florida residence insufficient].

In support of its contention that the defendants made a false oath with respect to the defendant/husband's residence, the plaintiff called as a witness Thomas R. Shanahan, general manager of the Sheraton Suites. He testified that TWA regularly reserves and pays for rooms at the Sheraton Suites on behalf of its layover crews (Document No. 54, Tr. at 239, lines 14–20). Each crewmember is required to identify him or herself prior to receiving a room key, although sometimes the captain signs in the entire crew (Document No. 54, Tr. at 241, lines 11–25). In all cases, the hotel keeps a record of the individual TWA crewmembers that stay in the hotel, identifying each crewmember with a specific room (Document No. 54, Tr. at 238, lines 16–24).

Mr. Shanahan testified that the defendant/husband did not register as a guest at the hotel during the six months preceding the defendants' bankruptcy filing, either as a paying guest or as a TWA crewmember (Document No. 54, Tr. at 236, lines 11–24). The court credits this testimony.

Moreover, substantially all of the evidence in the record that relates to this issue is consistent with this testimony and supports the plaintiff's theory that the defendants were not separated but in fact resided together at 15930 St. Charles Harbour, Ft. Myers, during the six months preceding their bankruptcy filing.

For example, neither defendant consulted or retained an attorney in connection with the separation (Document No. 53, Tr. at 212, lines 17–22). Nor did they take any action to sever their financial relationship (Document No. 52, Tr. at 10–13, and Document No. 53, Tr. at 212, lines 23–25). Indeed, they opened a new joint checking account at Fifth Third Bank during this period (Plaintiff's Exhibit No. 29, Document No. 52, Tr. at 91, lines 9–20). In addition, during the period in which they were purportedly separated, the defendants went on a "family" vacation to Barcelona, Spain, with their son (Document No. 53, Tr. at 213, lines 1–3).

The defendant/husband made no attempt to forward mail to the Sheraton

Suites but instead maintained his Ft. Myers' address as his "billing address" (Document No. 52, Tr. at 32, lines 17–25). He regularly returned to Ft. Myers to review financial information, including bank statements, paychecks, credit card and other bills, and to transact financial business (Plaintiff's Exhibit Nos. 17, 18, 19, 20, 21, 22, 24, 25, 26, 27, and Document No. 52, Tr. at 72–110). The defendant/wife made no attempt to contact her husband at the Sheraton Suites or to forward messages to him there with respect to his business dealings or their shared financial dealings (Document No. 53, Tr. at 191, lines 24–25, and at 192, lines 1–6).

In addition, the defendant/husband did not take any of the actions set forth in *Lordy* that would indicate an intention to effectuate a legal change of residence. He did not change the address on his driver's license (Plaintiff's Exhibit No. 4, Document No. 52, Tr. at 32, lines 8–16, and at 41, lines 7–14). He did not change the address on his voter's registration (Document No. 52, Tr. at 33, lines 14–23). He claimed a homestead exemption for the Ft. Myers' residence in both 1999 and 2000 (Document No. 52, Tr. at 33, lines 3–9). Finally, he signed a lease agreement with Mercedes Benz, listing the Ft. Myers' address as his residence, shortly before the filing of the bankruptcy petition (Plaintiff's Exhibit No. 3, and Document No. 52, Tr. at 40, lines 1–21).

Based upon this testimony and evidence, all of which the court credits, it is clear that the plaintiff has satisfied its burden of persuasion in establishing that the defendants made a false oath with respect to the defendant/husband's residence.

### b. *Income and expenses.*

■ The plaintiff argues that the defendants made false oaths or omissions with respect to their income and expenses. Specifically, the plaintiff asserts the defendants made four false oaths or omissions concerning their income and expenses: 1) understating their 1999 income in the statement of financial affairs; 2) understating the defendant/husband's monthly income attributed to TWA in Schedule I; 3) omitting the defendant/husband's right to receive income from his employment at Laurel Center from Schedules B and I; and 4) making a false oath concerning the defendant/husband's support expense in Schedule J.[4]

### i. *1999 Income.*

In response to Item No. 1 of the statement of financial affairs, the defendants listed income in the amount of $170,680 deriving from the husband/defendant's employment in 1999 (Plaintiff's Exhibit No. 1). The plaintiff contends that the defendants' tax return for that year establishes that the defendant/husband's gross income was actually $180,332 (Plaintiff's Exhibit No. 35). The court credits this evidence and concludes that the plaintiff has established that the defendants made a false oath with respect to the defendant/husband's 1999 income.

### ii. *TWA Monthly Income.*

■ Schedule I requires that the debtor provide an "estimate of average monthly income." The defendant/husband's monthly income from TWA fluctuated from month to month, depending on his flying schedule (Document No. 52, Tr. at 108, lines 2–21) (Document No. 52, Tr. at 100, lines 15–25, and at 101, lines 1–10). In his Schedule I, the defendant/husband listed his average monthly gross income as

---

4. Alternatively, the plaintiff asserts that the defendant/wife made a false oath in Schedule I by failing to include support paid by her husband.

$9,812, and his net income as $5,678 (Plaintiff's Exhibit No. 1).

The plaintiff contends that the defendant/husband's TWA pay stubs show that his average monthly salary in the six months preceding the bankruptcy filing was $10,254.20 (Plaintiff's Exhibit No. 35) The defendant/husband's testimony corroborates this contention (Document No. 52, Tr. at 100–103). The court credits this evidence and testimony and determines that the plaintiff has established that the defendants understated the defendant/husband's average monthly income from his employment with TWA.

### iii. *Monthly income from Laurel Center.*

■ The plaintiff contends that the defendants omitted from their schedules the defendant/husband's entitlement to receive wages from his employment with Laurel Center and thus understated their personal property in Schedule B in the amount of $27,500 and the defendant/husband's monthly gross income in Schedule I by an additional $5,500.

The defendants assert that the defendant/husband terminated his employment with Laurel Center in November 1999 (Document No. 53, Tr. at 177, lines 11–19, and at 217, lines 1–10).[5] The defendant/husband testified that he terminated his employment because he "didn't have time to handle two jobs" and because he was having "marital problems" (Document No. 53, Tr. at 177, lines 11–19). The defendants further assert that the defendant/husband resumed employment with Laurel Center in April 2000, following their bankruptcy filing and supposed reconciliation (Document No. 53, Tr. at 177, lines 11–19, and at 217, lines 1–10). The

defendants concede that they failed to amend their schedules to reflect the change in income upon the defendant/husband's resumption of employment with Laurel Center (Document No. 53, Tr. at 127, lines 22–24).

In support of its contention that the defendants omitted the defendant/husband's right to receive salary from Laurel Center for services performed between November 1999 and March 2000, the plaintiff put into the record a plethora of evidence. The evidence overwhelmingly demonstrates that the defendant/husband continued to be employed and to provide services to Laurel Center during the entirety of the period in which his employment had supposedly been terminated.

For example, the defendant/husband was the sole employee of Laurel Center (Plaintiff's Exhibit No. 36, Document No. 52, Tr. at 111, lines 21–24). Dr. Lowell did not hire a replacement upon the termination of the defendant/husband's employment (Document No. 53, Tr. at 129, lines 2–8). Dr. Lowell took no steps to change the designation of the defendant/husband as Laurel Centers' registered agent with the State of Florida (Document No. 53, Tr. at 128, lines 9–14). Dr. Lowell took no action to remove the defendant/husband as a signatory on its business bank account (Document No. 53, Tr. at 128, lines 15–25, and at 129, line 1).

The defendant/husband continued to write checks on behalf of Laurel Center from that account during the time he was supposedly no longer its employee (Plaintiff's Exhibit No. 58, Document No. 53, Tr. at 156–158). The defendant/husband also signed and filed with the State of Florida, in his capacity as comptroller of Laurel

---

**5.** The defendant/husband had held the job prior to his purported termination for several years and received a monthly salary during

that entire period in the amount of $5,500 (Document No. 53, Tr. at 165, lines 9–18).

Center, tax and employment reports (Plaintiff's Exhibit Nos. 52, 61, 63, 64, and 65, Document No. 53, Tr. at 145, and at 161–163). The defendant/husband performed numerous other functions during this time period, including making financial transactions, preparing and reconciling financial reports, dealing with correspondence, and coordinating and supervising work performed by outside professionals—all on behalf of Laurel Center (Plaintiff's Exhibit Nos. 37, 47, 53, 54, and 58, Document No. 53, Tr. at 130–158).

The defendant/husband also continued to provide services on behalf of the trusts (Document No. 52, at 50–53, and Document No. 53, at 130–156). In addition to maintaining and reconciling bank accounts for the trust properties, the defendant/husband corresponded with professionals and beneficiaries regarding management and financial issues (Plaintiff's Exhibit Nos. 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 48, 49, 50, 51, 55, 556, 57, and 59).

The defendant/husband performed many of these services on behalf of Laurel Center and the trusts at the Laurel Center business premises (Document No. 53, Tr. at 130–158).

The defendant/wife knew that the defendant/husband received a salary from Laurel Center (Document No. 53, Tr. at 11–22). During the period of time in which the defendant/husband was supposedly no longer working for Laurel Center, the defendant/wife was aware that the defendant/husband and Dr. Lowell continued to have business dealings and in some instances she relayed messages between the two (Document No. 53, Tr. at 199, lines 1–13).

Upon his purported resumption of employment with Laurel Center after the bankruptcy filing, the defendant/husband received a lump sum payment of $27,500, or the equivalent of 5 months salary (Plaintiff's Exhibit No. 37). The notation on the check register for that check reads "November—March Payroll" (Plaintiff's Exhibit No. 37).

The totality of this evidence compels the court to conclude that the defendant/husband did not terminate his employment with Laurel Center in November 1999 but instead continued to perform all or substantially all of his regular duties. Most telling is the fact that the defendant/husband was the only employee of Laurel Center and was not replaced upon his purported resignation but instead continued to hold himself out as an agent of the company. Although the defendant/husband did not receive a salary during this time period, the defendant/husband was clearly entitled to—and ultimately received—compensation for the services he performed. It is also important to note that the defendant/husband controlled the timing of the payment of his salary because he wrote the checks and maintained the financial and employment records for Laurel Center.[6]

Accordingly, the court determines that the defendants omitted the defendant/husband's entitlement to wages from Laurel Center from their bankruptcy schedules and understated the defendant/husband's monthly income from Laurel Center in the amount of $5,500 from Schedule I. The plaintiff has therefore established this false omission.

iv. *Support expense.*

■ The defendant/husband listed as an expense on his Schedule J support in

---

6. Although the defendant/husband reported to Dr. Lowell, it is uncontroverted that he retained control over the financial accounts of

Laurel Center during the entirety of the time he was purportedly not employed there.

the amount of $1,258 (Plaintiff's Exhibit No. 1). The plaintiff contends this is a false oath.[7] In support of its contention, the plaintiff put into the record copies of all checks written by the defendant/husband in the six months preceding the bankruptcy filing (Plaintiff's Exhibit Nos. 17, 18, 19, 20, 21, 22, 24, 25, 26, 27, 28, 29, 30, 31). A review of these checks shows that the defendant did not write any checks to the defendant/wife during this time that aggregate $1,258 per month. Indeed, the defendant/husband wrote no checks to the defendant/wife at all. The court therefore determines that the plaintiff has established that the support listed on the defendant/husband's Schedule J is a false oath.

Accordingly, the court determines that the plaintiff has established this false oath.

### c. *Property of the Estate.*

The plaintiff contends that the defendants have made false oaths with respect to the disclosure or valuation of property of the estate. Specifically, the plaintiff asserts that the defendants: 1) failed to schedule TWA stock; 2) failed to schedule their equity ownership of a dock and yacht club membership; 3) misrepresented the value of their real property; and 4) misrepresented the value of their personal property.

### i. *TWA Stock.*

In Schedule B, Item No. 12, the defendants checked none in response to whether they owned any stock (Plaintiff's Exhibit No. 1). The plaintiff contends that the defendant/husband owned TWA stock when the bankruptcy petition was filed.

In support of its contention, the plaintiff put into evidence two stock certificates totaling 535 shares that TWA issued to the debtor in early to mid February 2000 (Plaintiff's Exhibit Nos. 13 and 14). The plaintiff also put into evidence a TWA employee's receipt reflecting a $775.20 stock distribution in the pay period ending January 31, 2000 (Plaintiff's Exhibit No. 11. The defendant/husband's testimony corroborated this evidence (Plaintiff's Exhibit Nos. 13 and 14, Document No. 52, Tr. at 63, lines 1–19). The court credits this evidence and testimony. The court accordingly determines that the plaintiff has established this false oath.

### ii. *Yacht Club Membership.*

■ The plaintiff contends that the defendants made a false omission when they failed to include in Schedule B their equity ownership interest in the St. Charles Yacht Club. At the time of filing, a dock and yacht club membership similar to the one allegedly owned by the defendants had an approximate value of $50,000 (Document No. 54, Tr. at 246, lines 22–25, and at 247, lines 1–4). In support of this claim, the plaintiff called as a witness Carl H. Winslow, the registered agent and attorney of the St. Charles Yacht Club.

Mr. Winslow testified that in 1993 the defendants legally transferred their interest in the St. Charles Yacht Club to their then minor son (Document No. 54, Tr. at 244, lines 8–14). The son attained his majority in 1995.

Mr. Winslow further testified that the son has been receiving revenues from the rental of the dock (Document No. 54, Tr. at 247, lines 20–25, and at 248, lines 1–2).

---

**7.** Although the plaintiff did not include the defendants' food expenses in its claim of false oaths, the court notes that the defendants listed a monthly expense for that item in the total amount of $1,262 (Plaintiff's Exhibit No. 1, Schedules J). *See, e.g., In re Cox,* 249 B.R. 29, 32 (Bankr.N.D.Fla.2000) [finding $350 was a reasonable monthly food expense for one person rather than the $710 listed by the debtor].

Finally, Mr. Winslow testified that the son paid the 2001 dues on the St. Charles Yacht Club membership (Document No. 54, Tr. at 246, lines 12–16, at 248, lines 14–25, and at 249, lines 1–7).

The court credits this testimony. From this testimony, it is apparent that the defendants do not have a legal or beneficial interest in the dock and yacht club membership, notwithstanding their continued use of the facilities (Document No. 54, Tr. at 267, lines 4–24). The plaintiff has therefore failed to establish this false omission.

### iii. *Homestead Real Property.*

In Schedule A, the defendants listed joint ownership of real property located at 15930 St. Charles Boulevard, Ft. Myers, Florida, with a value of $475,000. The plaintiff asserts that this is a false oath.

In support of this assertion, the plaintiff called as witness, H. Neal Scott, a real and personal property appraiser. Mr. Scott testified that the debtor's homestead is located in one of the few deep-water access neighborhoods off the Caloosahatchee River, an exclusive, affluent, gated community where homes range in value from $325,000 to $3 million (Document No. 53, at 252, lines 16–18). Mr. Scott further testified that, in his opinion, the defendants' real property had a value of $770,000 at the time the defendants filed their bankruptcy petition (Plaintiff's Exhibit No. 68, Document No. 52, Tr. at 254, lines 1–11). The court credits this testimony. Accordingly, the plaintiff has established that the defendants made this false oath.

### iv. *Personal Property.*

▇ In Schedule B, the defendants listed personal property, including house-

hold goods and furnishings, books, clothing, costume jewelry, and outdoor equipment in the amount of $1,685.[8] The plaintiff contends that the defendants made a false oath with respect to the value of their personal property.

▇ In support of its contention, the plaintiff put into evidence the defendants' homeowner's and flood insurance policies (Plaintiff's Exhibit Nos. 9 and 10). These policies show that the defendants carry replacement insurance in the amount of $293,240 and $100,000, respectively, on their personal property. The court does not credit this evidence as to the value of the personal property because the personal property coverage contained in these policies is determined by the value of the real property insured rather than through an accounting and appraisal of the defendants' personal property (Document No. 52, Tr. at 57, lines 1–13).

▇ Mr. Scott also testified on behalf of the plaintiff as to the value of the defendants' personal property. He testified that, in his opinion, the defendants' personal property had a value of $2,000 at the time the defendants filed their bankruptcy petition (Plaintiff's Exhibit No. 67, Document No. 54, Tr. at 255, lines 13–25, and at 256, lines 1–6). Upon cross-examination, Mr. Scott admitted that his appraisal (conducted well after the petition was filed) did not distinguish between items that had been purchased before and after the petition date (Document No. 54, Tr. at 256, lines 22–25, and at 257, lines 1–12). In addition, Mr. Scott's appraisal does not contain any specificity as to particular items and the value ascribed to them. Accordingly, the court does not credit this testimony or evidence.

---

**8.** The court calculates this amount by adding $1,330 claimed for household goods, $50 claimed for books and pictures, $200 claimed for clothing and shoes, $45 claimed for costume jewelry, and $60 claimed for exterior equipment.

Although the evidence does not permit the court to determine the value of the defendants' personal property at the time of the petition, the totality of the evidence overwhelmingly establishes that the personal property and furnishings of the defendants were worth well in excess of the $1,685 that the defendants scheduled. Such a low value is completely inconsistent with the value of the home, their luxury automobile, their income, and their lifestyle. The court is firmly convinced, therefore, that the defendants made a false oath when they scheduled their personal property at such a ridiculously low value.

The court determines, therefore, that the plaintiff has established this false oath.

#### d. *Gift.*

In their statement of financial affairs, the defendants indicated that they had made no gifts with an aggregate value of $200 or more within the year preceding their bankruptcy filing (Plaintiff's Exhibit No. 1, Statement of Financial Affairs, Item No. 7). The plaintiff alleges that this statement is a false oath because the defendants failed to disclose the trip to Spain in 1999 for which they paid the costs on behalf of their son.[9]

The plaintiff made no evidentiary record in support of this claim other than through the testimony of the defendant/wife. The defendant/wife testified that the trip to Spain "probably" cost more than $200 (for the family) but that she did not have per-

sonal knowledge of its cost because the defendant/husband paid it (Document No. 53, Tr. at 214, lines 3–20).[10] The court credits this testimony. The defendant/husband did not testify as to the cost of the trip or the portion attributable to his son. The plaintiff has, therefore, not provided sufficient evidence or testimony to carry its burden of persuasion as to this false oath.

#### e. *Prepetition payments to creditors.*

In their statement of financial affairs, the defendants indicated that they had made no payments to creditors on loans, installment purchases of goods or services, or other debts aggregating more than $600 within the 90 days preceding the filing of their bankruptcy petition (Plaintiff's Exhibit No. 1, Statement of Financial Affairs, Item No. 3). The plaintiff asserts that this is a false oath because the defendants made a number of payments in the 90 days preceding the filing of the case.[11] Specifically, the plaintiff contends that the defendants failed to disclose payments in the aggregate amount of $17,151.75, representing three payments to Bank of America in the total amount of $3,154.75, two payments to Creative Custom Cabinets in the total amount of $8,687, and one payment to the St. Charles Harbour Homeowner's Association in the amount of $2,600.[12] The plaintiff produced evidence in support of its allegation (Plaintiff's Exhibit Nos. 5, 22, 25, and 30). The court credits this evi-

---

9. The parties did not include this claim of false oath or omission in their pretrial stipulation. At trial, however, the parties put on evidence and made argument as to it. The court will therefore determine the claim as tried.

10. As an employee of TWA, the defendant/husband was entitled to free or low cost airfare for himself and his dependents.

11. The parties did not include this claim of false oath or omission in their pretrial stipulation. At trial, however, the parties put on evidence and made argument as to it. The court will therefore determine the claim as tried.

12. The defendant/wife made one payment to Bank of America. The defendant/husband made all of the other payments.

dence. The plaintiff has therefore established this false oath.

f. *Summary.*

The plaintiff has established that the defendants made eleven false oaths or omissions with respect to: the defendant/husband's residence; the defendant/husband's 1999 income; the defendant/husband's monthly income from TWA; the defendant/husband's continuing employment with Laurel Center and his entitlement to wages; the defendant/husband's rent expense; the defendant/husband's support expense; the defendant/husband's legal ownership of trust properties; the defendant/husband's ownership of TWA stock; the value of the defendants' homestead real property; the value of the defendants' personal property; and the defendants' failure to disclose prepetition payments to creditors.

2. *Were the defendants' false oaths or omissions material?*

■ Although not specifically contained in the statute, courts have also imposed a test of materiality to "ensure that debtors are not denied discharge for inconsequential or technical omissions." *Murray*, 249 B.R. at 228. "Materiality is broadly defined." *Wills*, 243 B.R. at 62. A false oath or claim is material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence of disposition of his property." *Chalik*, 748 F.2d at 618. In other words, a "material fact is one that affects the substance of the case, rather than merely

going to the form of the case." *Hunter v. Sowers (In re Sowers)*, 229 B.R. 151, 158 (Bankr.N.D.Ohio 1998).

The plaintiff contends that all of the false oaths or omissions that it has established are material because they relate to either the venue of the case, the financial condition of the defendants, or the property of the estate. On the other hand, the defendants argue that the false oaths or omissions are not material, especially those relating to the value of property that is claimed as exempt.

a. *Venue.*

■ The defendants argue that the falsification of the defendant/husband's address is not material in that it "does not bear any relationship to business transactions, estate, discovery of assets, business dealings or the existence or disposition of property . . . ." (Document No. 55).

The defendants' use of a false address allowed them to file their bankruptcy case in the Tampa division of the Middle District of Florida, rather than in the Ft. Myers division that would have otherwise been required.[13] Thus, the defendants' false oath directly affected the venue within the district of the case.

■ Issues of venue are core matters under 28 U.S.C. § 157(b)(2)(A) that concern the administration of the estate. *In re Waits*, 70 B.R. 591, 594 (Bankr.S.D.N.Y. 1987). In determining issues of venue, the court considers various factors:

---

**13.** 28 U.S.C. § 1408(1) provides in pertinent part that a bankruptcy case must be commenced in the district "in which the domicile, residence . . . of the person or entity that is the subject of such case have been located for the 180 days preceding such commencement . . . ." L.B.R. 1071–1 further provides that "[a]ll cases shall be commenced in that Division in which the domicile, residence . . . of the person or entity that is the subject of such case [has] been located for the 180 days immediately preceding such commencement . . . ." Because the defendants' residence or domicile is located in Lee County, the proper venue for this case would have been the Ft. Myers Division.

(1) The proximity of creditors of every kind to the Court;

(2) The proximity of the debtors to the Court;

(3) The proximity of witnesses necessary to the administration of the estate;

(4) The location of the assets;

(5) The economic administration of the estate;

(6) The necessity for ancillary administration if bankruptcy should result.

*In re Townsend,* 84 B.R. 764, 767 (Bankr. N.D.Fla.1988).

Clearly, administering a bankruptcy estate approximately 135 miles away from the situs of the case presents logistical and economic disadvantages that implicate the factors cited in *Townsend.* For example, the trustee is less likely to have personal knowledge of the local real estate market and economy. Similarly, she is less likely to have established relationships with bankruptcy professionals who regularly work in that locale. Obtaining first-hand information about the estate's assets may be more difficult and less cost-efficient if the trustee is required to travel to the debtors' residence. For these reasons, the trustee is more likely to accept without dispute the debtors' schedules and statement of financial affairs than she might otherwise be.[14] In addition, the trustee may be hindered in securing witnesses in the event that a contested matter arises.

■ The court determines, therefore, that a false oath that implicates venue issues affects the substantive administration of the bankruptcy case and is material.

b. *Financial condition.*

■ It is well settled that a false oath or claim that causes the debtor's financial status to be misrepresented may be material. *Neugebauer v. Senese (In re Senese),* 245 B.R. 565, 574 (Bankr.N.D.Ill. 2000) [discharge denied because debtor provided false or misleading information about his financial affairs]; *Haught,* 242 B.R. at 526 [information needed to determine financial condition is material]; *Wills,* 243 B.R. at 63 [false statement or omission is material if it "adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing or financial condition"]; *Hoblitzell,* 223 B.R. at 215–16 [disclosure is material "if it aids in understanding the debtor's financial affairs and transactions"].

The defendants argue that the false oaths or omissions made with respect to their financial condition were errors arising out of a rushed bankruptcy filing and were inadvertent rather than material. First, the court does not credit the "rushed" filing testimony. The evidence was that the defendants had been in contact with bankruptcy counsel for some time. They had ample opportunity to plan their bankruptcy filing and did so. The defendant/husband is a CPA. He does not rush into making "mistakes" like the ones here. Instead, he intentionally gave the information contained in the schedules. The defendant/wife is similarly precise. These were not "mistakes" because of rushing.

■ Second, the defendants misconstrue the way in which materiality affects the court's determination under Section 727(a)(4)(A). Materiality goes to the de-

**14.** Indeed, in this case, the trustee initially did just that when she filed her report of no assets and no distribution.

**350**

gree and substance of the false oath or omission rather than the reason behind the making of the false oath or omission. The defendants' false oaths and omissions are significant errors that directly related to their financial condition and the circumstances leading up to the bankruptcy filing. Accordingly, the court determines that the defendants' false oaths or omissions relating to their financial condition are material.

### c. Property of the estate.

 The defendants assert that false oaths or omissions that relate to property of the estate that is claimed and allowed as exempt cannot be material because the property is not administered for the benefit of creditors. In making this argument, however, the defendants are "putting the cart before the horse". "Property is not exempt by fiat of the debtor[s], but only through a process of compliance with statutory disclosures ...." *Murray*, 249 B.R. at 231. "Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or unavailable to the bankruptcy estate." *Id.*, quoting *In re Sapru*, 127 B.R. 306, 313 (Bankr.E.D.N.Y.1991). "It is therefore meaningless to say that [accurate] disclosure is not required because property is exempt. Property can only become exempt through a legal process that includes disclosure." *Id.*

 Indeed, a debtor is required to schedule all assets, whether claimed exempt or not, regardless of the debtor's perception of the asset's worth. *Hoblitzell*, 223 B.R. at 215. "A disclosure's materiality is not determined by whether it may financially prejudice the estate or creditors. An omitted asset may ultimately be found to have no value, but its disclosure is necessary 'if it aids in under-

standing the debtor's financial affairs and transactions.'" *Id.* at 215–216, quoting *In re Coombs*, 193 B.R. 557, 563 (Bankr. S.D.Cal.1996). The false oaths and omissions that the plaintiff has established here affected the creditors' and trustee's ability to understand the defendants' financial affairs and transactions. The court therefore determines that these false oaths and omissions are material.

### 3. Did the defendants make the false oaths and omissions with knowledge and fraudulent intent?

 The plaintiff contends that the defendants made the false oaths and omissions established in Section IV.A.1. above with knowledge of their falsity and with fraudulent intent. "Fraudulent intent must be shown by actual, not constructive fraud." *Murray*, 249 B.R. at 228. Absent direct evidence of actual fraud, the plaintiff may establish actual fraud in one of two ways. *Hatton*, 204 B.R. at 484.

 First, the plaintiff may show that the debtor has engaged in a pattern of concealment. *See, e.g., Haught*, 242 B.R. at 525 ["pattern of concealment and nondisclosure would permit an inference of the requisite intent"]; *Wills*, 243 B.R. at 64 [debtor's fraudulent intent may be established by circumstantial evidence or by inferences drawn from a pattern of falsity].

 Second, the plaintiff may show the debtors' reckless indifference to the truth. *Murray*, 249 B.R. at 228.

### a. Pattern of Concealment.

In *Keeling v. Ozey (In re Ozey)*, 172 B.R. 83, 89 (Bankr.N.D.Okla.1994), the court found that the debtor had shown a pattern of self-interest that compelled the denial of his discharge. The court concluded that this pattern had resulted in the

"obstruction of the legitimate interests of creditors" and the trustee. *Id.* at 91.

Similarly, in *Salfi v. Prevatt (In re Prevatt)*, 261 B.R. 54, 57 (Bankr.M.D.Fla. 2000), the court found that the debtor made several false oaths or omissions that were designed to obscure his "true financial condition." For example, he failed to disclose over-time pay because it "varied" and did not disclose assets that he believed were exempt or of no value. *Id.* On these facts, the court concluded that the "sophisticated Defendant was trying to pull a fast one" and denied his discharge. *Id.*

The defendants in this case have demonstrated a pattern of self-interest at the expense of their creditors and the Chapter 7 trustee that is consistent with that described in *Ozey* and *Prevatt.* The defendants took affirmative steps before filing bankruptcy to secure the maximum advantage in their prospective bankruptcy. They closed a brokerage account. They liquidated TWA stock. They also made a series of large payments, in part for home remodeling projects, shortly before filing, using all of their available cash. The defendants traded in an unencumbered vehicle for a luxury automobile with a hefty monthly lease payment. Finally, the defendant/husband executed a sham termination of his employment with Laurel Center Management to reduce his apparent income. Although the court makes no judgment here as to the propriety of these actions as prebankruptcy planning, they do provide a backdrop that illuminates the defendants' false oaths and omissions within the bankruptcy case itself.

The false oaths and omissions in this case establish a pattern of concealment and false disclosure. The defendants continued to seek every advantage within the bankruptcy court as they had done before the filing of their petition. The defendants made a false oath as to the defendant/husband's residence to establish a venue different than the one that was otherwise required. The defendants made false oaths and omissions that served to understate their income and overstate their expenses resulting in the appearance of insolvency. Finally, the defendants made false oaths and omissions with respect to property of the estate thereby creating an inference that the estate was without assets and obscuring financial transactions taken prior to the bankruptcy filing. Accordingly, the plaintiff has established that the defendants' false oaths and omissions were made knowingly and fraudulently.

b. *Debtors' reckless indifference to the truth.*

■ In *Hatton,* 204 B.R. at 484, the court noted that multiple inaccuracies in a debtor's petition and bankruptcy schedules taken cumulatively evidences a "cavalier disregard for the truth serious enough to supply the necessary fraudulent intent required by § 727(a)(4)(A)." Similarly, the defendants here have displayed a cavalier and reckless attitude in making the disclosures required in their bankruptcy petition, schedules, and statement of financial affairs.

■ The defendants seek to excuse and explain their "cavalier disregard for the truth" with respect to the false oaths and omissions contained in their schedules and statement of financial affairs by claiming they were inadvertent errors resulting from their ignorance of bankruptcy and the hurried manner in which the papers were prepared. The court does not credit this explanation. The defendants are highly educated and used to dealing with sophisticated financial transactions. The defendant/husband is punctilious in his personal record keeping. The defendant/wife testified that as a former English teacher she "usually got out [her] red pen"

and corrected mistakes in the homeowner's association newsletter (Document No. 54, Tr. at 264, lines 5–10). Clearly both defendants understood the importance of a careful review of their bankruptcy papers. More importantly, it was the defendants' obligation to ensure that the petition, schedules, and statement of financial affairs were accurate and truthful. *Hembree,* 186 B.R. at 532 [debtor is ultimately responsible for the completeness and accuracy of his or her petition and schedules].

Nor is there any corroborative evidence in the record that suggests that the defendants made a rushed bankruptcy filing. The defendants were aware of the possibility of collection activity against them years before they filed bankruptcy. They had consulted bankruptcy counsel and had considerable time to understand the implications and consequences of filing bankruptcy. Although the plaintiff garnished the defendants' bank account in January 2001, it thereafter took no further action against the defendants or their property.

Even were the court to credit this explanation and find the defendants' false oaths and omissions to be innocent and inadvertent—which it does not—it is important to point out that the defendants have made absolutely no attempt to amend their petition and schedules to correct the false oaths and omissions. In *Green,* 268 B.R. at 648, the court noted that a debtor's failure to promptly amend schedules "can be considered reckless indifference to the truth and is tantamount to fraud."

### c. *Summary.*

For the reasons stated above, the court determines that the plaintiff has established that the defendants' made 11 false

oaths and omissions knowingly and fraudulently.

**4.** *Did the defendants carry their burden of persuasion to rebut the false oaths or omissions established by the plaintiff?*

The plaintiff has established that the defendants knowingly and fraudulently made 11 false oaths or omissions in their petition, schedules, and statement of financial affairs that were material. Accordingly, the burden shifts to the defendants to rebut those false oaths or omissions.

The defendants conceded their false oaths or omissions with respect to the defendant/husband's ownership of trust properties and the defendant/husband's rent expense. The plaintiff has therefore established these false oaths and omissions.

The defendants offered rebuttal testimony as to the remaining false oaths or omissions.

### a. *Defendant/husband's residence.*

The defendants continued throughout the trial to vigorously insist that the defendant/husband resided at the Sheraton Suites during the majority of the six month period preceding the defendants' bankruptcy filing. Indeed, in a rather bizarre and unique twist, the defendant/husband sought to explain the apparent absence of any record of his stays at the Sheraton Suites during the relevant time period by admitting that he defrauded both the hotel and his then employer, TWA, by using rooms meant for and signed out to TWA crewmembers who, for whatever reason, were unable or unwilling to use the room themselves (Document No. 53, Tr. at 170, lines 13–25, and at 171, lines 1–9).[15] The defendant/husband offered no

---

**15.** In an apparent effort to excuse the defendant/husband's fraudulent conduct in using a

room intended for another crewmember, the defendants assert in their post-trial memoran-

evidence or testimony, other than his own, to corroborate this explanation.

The defendant/husband's testimony with respect to his residence was inconsistent and ambiguous and thus not credible. Even accepting the defendant/husband's testimony as true—which the court does not do—the record reflects that, at most, the defendant/husband spent only one or two days each month at the Sheraton Suites (Document No. 53, Tr. at 169, lines 19–25, and at 183, lines 15–22). The defendant/husband, by his own admission, spent the balance of the time that he was not flying for TWA at 15930 St. Charles Harbour (Document No. 52, Tr. at 36, lines 17–25). Indeed, the defendant/husband's own testimony is revealing. When asked where he stayed when in Ft. Myers, he responded "At my *residence*—St. Charles Harbour" (Document No. 52, Tr. at 34, lines 10–20).

Accordingly, the defendants have not rebutted this false oath.

b. *1999 Income.*

The defendants explain the discrepancy between Item No. 1 of the statement of financial affairs and the 1999 tax return by pointing to additional income of $16,883 listed in Item No. 2 of the statement of financial affairs deriving from the defendant/wife's income from workmen's compensation and retirement benefits. The defendants argue that this additional income added to the defendant/husband's 1999 wages is approximately equal to the income reflected in their 1999 joint income tax return. Income derived from the defendant/wife's workmen's compensation

and retirement benefits, however, is not included in the gross income reflected in the defendants' 1999 income tax return (Plaintiff's Exhibit No. 32).

Accordingly, the defendants have not rebutted this false oath.

c. *1999 TWA income.*

The defendants did not offer any testimony, evidence, or argument in rebuttal of this false oath other than a general statement that the amount listed in Schedule I was an averaged amount (Document No. 53, Tr. at 126, lines 6–18). The court does not credit this testimony.

Accordingly, the defendants have not rebutted this false oath.

d. *Laurel Center Income.*

In rebuttal, the defendant/husband contended that he performed services for Laurel Center as a courtesy to Dr. Lowell and with no expectation of compensation (Document No. 53, Tr. at 164, lines 15–25, and at 165, lines 1–7). The defendants supported their contention solely with testimony of the defendant/husband. The defendants did not provide any evidence or testimony that would otherwise support their contention.

The defendant/husband testified inconsistently with respect to the April lump sum payment. At various times during the trial, the defendant/husband alternatively referred to that payment as an incentive to return to work, a bonus, and a pay raise (Document No. 52, Tr. at 116, lines 8–10, and Document No. 53, Tr. at 125, lines 7–18). When pressed by the

dum (Document No. 55) that TWA was obligated to pay for these rooms regardless of whether they were used by anyone. Mr. Shanahan testified, however, that the Sheraton Suites was required to maintain a list of TWA crewmembers who had registered with the hotel to obtain payment from TWA (Document No. 54, Tr. at 241, lines 11–17). This testimony, that the court credits, suggests that TWA paid only for those rooms that were actually used by its crewmembers.

plaintiff, however, the defendant/husband acknowledged that he received the lump sum for services performed between November 1999 and March 2000 (Document No. 53, Tr. at 125, lines 19–24). The court credits only this latter testimony.

Finally, the defendant/husband testified that he ceased using a company vehicle provided by Laurel Center in November 1999 (Document No. 53, Tr. at 129, lines 14–25, and at 130, lines 1–2). In the absence of any contrary evidence or testimony, the court credits this testimony. This testimony alone, however, is insufficient to rebut the overwhelming weight of evidence that establishes that the defendant/husband was continuously employed by Laurel Center and was entitled to compensation for his services.

Accordingly, the defendants have not rebutted this false omission.

### e. *Support expense.*

The defendants contend that the defendant/husband paid support to the defendant/wife during their supposed separation through indirect means. The defendants supported this contention solely through their own testimony. The defendant/husband testified that he paid support to the defendant/wife through payment of the wife's charges on a Bank of America Visa account (Document No. 53, Tr. at 167, lines 20–25, and at 168, lines 1–4). The defendants' explanation as to the support expense is unbelievable.

The court has determined in Section IV. A.1.a. above that the defendants did not take any steps to establish individual living arrangements. Had they done so, however, it is incredible that the defendant/husband would have provided support to the

defendant/wife by paying a joint obligation that is not even reflected as an expense item in the schedules, and that is dischargeable in bankruptcy, when the defendant/wife's income of $1,319 was woefully inadequate to meet her monthly expenses of $3,618 (Plaintiff's Exhibit No. 1, Schedules I and J).

Even were the court to credit the defendant/husband's payment of support to the defendant/wife, it would still implicate a false oath because the defendants did not list in their Schedule I any income deriving from alimony, maintenance, or support attributable to the defendant/wife (Plaintiff's Exhibit No. 1, Schedule I).

Accordingly, the defendants have not rebutted this false oath.

### f. *TWA stock.*

▮ The defendants assert that the defendant/husband did not receive the TWA stock certificates until after the filing of the bankruptcy petition (Document No. 52, Tr. at 65, lines 1–17, and at 66, lines 15–19). The court does not credit this testimony. In addition, the record reflects that both defendants were aware that the defendant/husband's compensation package from TWA included periodic distributions of TWA stock (Document No. 53, Tr. at 179, lines 1–5, and at 197, lines 12–22).[16]

Accordingly, the defendants have not rebutted this false omission.

### g. *Valuation of homestead real property.*

▮ The defendants assert that they legitimately based their valuation of their homestead real property on the valuation

16. Although it is uncontroverted that the stock is part of the defendant/husband's compensation from TWA, the defendants cannot claim the stock as exempt wages. *In re Lan-* *caster*, 161 B.R. 308, (Bankr.S.D.Fla.1993) [wage exemption applies only to bank accounts].

given by the Lee County Property Appraiser for that property for ad valorem tax purposes (Document No. 53, Tr. at 173, lines 3–8). In support of this assertion, the defendants offered only their own testimony. The defendant/wife testified that the value the defendants ascribed to their homestead was consistent with real estate prices and values in the area (Document No. 53, Tr. at 196, lines 3–7). The court does not credit this testimony.

Mr. Scott, who serves as a special master for valuation objection cases in the area, testified that assessed value is generally lower than the market value of real property in Lee County (Document No. 54, Tr. at 258, lines 3–7). The court credits this testimony. The court also notes that the defendant/husband is himself a real estate salesman who has sold at least one piece of residential real estate in the last eighteen months. In these circumstances, one would expect that the defendant/husband would well understand the distinction between an assessed value for tax purposes and a market value.

Accordingly, the defendants have not rebutted this false oath.

### h. *Valuation of personal property.*

The defendants assert that they obtained an appraisal of their personal property that supported the valuation used in their bankruptcy schedules ((Document No. 53), Tr. at 173, lines 9–20). The defendants were unable to locate the appraiser for trial and thus did not offer the appraisal or the appraiser's testimony into evidence. The court does not credit the defendants' testimony as to the valuation of their personal property.

Accordingly, the defendants have failed to rebut this false oath.

### i. *Prepetition payments.*

The defendants concede that they made prepetition payments but argue that the payments were not payments "on loans, installment purchases of goods or services or other debts" but rather were ordinary expenses or payments made contemporaneous to the date of service. The defendants offered no evidence in support of their position other than their own general testimony that the court does not credit.

Accordingly, the defendants have not rebutted this false omission.

### 5. *Conclusion.*

The plaintiff has established that the defendants knowingly and fraudulently made 11 material false oaths or omissions within the meaning of Section 727(a)(4)(A). The defendants discharge must therefore be denied.

### B. *Section 727(a)(3).*

 The plaintiff also seeks a denial of the defendants' discharge pursuant to Section 727(a)(3) of the Bankruptcy Code on the basis that they failed to preserve books, records, and other documents. This section is "designed to ensure that the bankruptcy trustee and other creditors will have sufficient information to permit an effective evaluation of the debtor's estate, and is a condition precedent to the granting of a discharge in bankruptcy." *Senese,* 245 B.R. at 576. "The court has wide discretion in determining the sufficiency of records." *Savel,* 29 B.R. at 856.

 The court is required to determine whether the books and records of the debtor "are adequate to permit the court and creditors to trace the debtor's financial dealings." *Id.* "[P]erfection in record keeping is not required but creditors examining the records of the debtor must be reasonably able to follow the debtor's business transactions, make intelligent inquiry,

verify the oral statements and explanations of the bankrupt, and ascertain the present and past financial condition of the bankrupt [with] substantial completeness and accuracy." *County National Bank of South Florida v. Savel (In re Savel)*, 29 B.R. 854, 856 (Bankr.S.D.Fla.1983).

■ "Depending upon the sophistication of the debtor and the extent of his activities, different record keeping practices are necessary." *Meridian Bank v. Alten (In re Alten)*, 958 F.2d 1226, 1231 (3d Cir.1992) ["Sophisticated business persons are generally held to a high level of accountability in record keeping."]. For example, "[a]ttorneys and other professionals may be held to the standard of care ordinarily exercised by members of their profession." *Id.* at 1232.

■ The plaintiff carries the initial burden to show lack of records when making a challenge pursuant to Section 727(a)(3). *Id.* Once the plaintiff has satisfied its burden, the burden shifts to the debtor to show that the absence of the records is justified under all relevant circumstances. *Id.*

The plaintiff alleges that the defendants failed to preserve credit card statements. The defendants acknowledge their failure to retain credit card statements but argue that the absence of these records is justified in light of the voluminous production of documents that they made to the trustee and creditors as to all other financial matters.

■ The record reflects that the defendants made four payments on credit card debt to Bank of America in the total amount of $8,138.95 in the months preceding the filing of the petition (Plaintiff's Exhibit Nos. 24, 25, 26, and 30).[17] The

defendants made these payments during a time in which they were clearly engaged in pre-bankruptcy planning. In these circumstances, the defendants' credit card statements are necessary to determine with "completeness and accuracy" the defendants' financial transactions prior to bankruptcy. A cancelled check reflecting payment on a credit card account is insufficient when it is apparent that large sums have been paid immediately prior to the bankruptcy filing. The plaintiff has therefore carried its burden of persuasion and the burden shifts to the defendants to justify their failure to keep records in the circumstances.

■ The record reflects that it is the defendant/husband who maintains the family's financial records (Document No. 52, Tr. at 72–97). The defendant/husband is a CPA and accordingly must be held to the standard expected of accountants. *Alten*, 958 F.2d at 1231. The defendant/husband testified that it is his routine practice to discard credit card statements after verifying the accuracy of the charges and paying the outstanding balance (Document No. 53, Tr. at 181, lines 24–25, at 182, lines 1–3).

The court does not credit this testimony. The record reflects that the defendant/husband is meticulous in the manner in which he maintains and reconciles the family's financial records. The defendant/husband's explanation for the destruction of his credit card statements, reflecting transactions in the thousands of dollars, is wholly inconsistent with the way in which the defendant/husband otherwise handles the family's financial records.

For these reasons, the court determines that the plaintiff has established that the defendant/husband failed to preserve books, records, or other documents within

---

**17.** The defendant/husband made three of these payments and the defendant/wife made one. There is no record as to payments made prior to October 1999.

the meaning of Section 727(a)(3). The court will deny the discharge of the defendant/husband on this basis.

#### C. Section 727(a)(5).

 The plaintiff further seeks a denial of the defendants' discharge pursuant to Section 727(a)(5) of the Bankruptcy Code on the basis that they failed to explain satisfactorily a loss of assets or deficiency of assets to meet the defendants' liabilities. Under this section, the creditor has the initial burden to show why, or how, the defendants have failed to explain a loss of assets. *Chalik*, 748 F.2d at 619; *Green*, 268 B.R. at 649. Once the creditor meets its burden of proof, the burden shifts to the debtor to provide a satisfactory explanation of the loss of assets. *Chalik*, 748 F.2d at 619 ["The creditor's burden of persuasion does not obviate the necessity that the debtor provide a satisfactory explanation of the loss of his assets."].

 "The question of whether a debtor satisfactorily explains a loss of assets is a question of fact." *Id.* "To be satisfactory, 'an explanation' must convince the judge." *Id., quoting In re Shapiro & Ornish*, 37 F.2d 403, 406 (N.D.Tex.1929). It is important to note, however, that the court is not concerned with "whether the disposition of the assets was proper under the Bankruptcy Code, but rather only whether the explanation satisfactorily describes what happened to the assets." *Sonders v. Mezvinsky (In re Mezvinsky)*, 265 B.R. 681, 690 (Bankr.E.D.Pa.2001).

In this case, the plaintiff contends that the defendants have failed to explain satisfactorily the loss of assets from several bank accounts in December 1999 and Jan-uary 2000 (Document No. 45, ¶ C.1).[18] In December 1999, the defendant/husband made several sizable cash withdrawals from the defendants' joint checking account in the total amount of $11,000 (Plaintiff's Exhibit No. 20). Similarly, in January 2000, the defendant/husband made withdrawals from the defendants' joint checking account in the total amount of $13,000 (Plaintiff's Exhibit No. 21). The plaintiff has therefore satisfied its burden of persuasion and the defendants must provide an explanation as to the disposition of this money.

The defendants have provided complete and comprehensive records to the plaintiff, including copies of canceled checks, that identifies with specificity how the defendants' used the $24,000 that was withdrawn in December 1999 and January 2000 (Plaintiff's Exhibit Nos. 25, 26, 29, and 30). The court credits this evidence and determines that the defendants have satisfactorily explained the disposition of monies in December 1999 and January 2000. Accordingly, the plaintiff's claim for the denial of the defendants' discharge pursuant to Section 727(a)(5) must fail.

#### V.

Although the cases cited above are clear that the plaintiff is not required to establish the debtor/defendants' motive in cases like this one, it is worthy of note that the record does not contain an explanation for why the defendants went to such lengths to place this case in the Tampa division, instead of the Ft. Myers division where it should have been, and to obscure and distort their personal and financial condition. The court can do nothing but speculate—

---

**18.** In the pretrial stipulation (Document No. 45), the plaintiff described a claim for the failure to explain losses in December 1999 only. At trial, however, the parties put on evidence and made argument as to the defen-dants' loss of assets from their bank accounts in December 1999 and January 2000. The court will therefore determine the claim as tried.

something that the court will not do. What is clear, however, is that it was enormously important to the defendants to keep the case out of the Ft. Myers division and to present themselves in a false light.

They concocted an elaborate and false story to do so. When called to task, they continued to embellish their false story, making matters worse. At trial, the defendant/husband gave the appearance of making up his story as he went along—all in a way that lacked any credible substance. Although the court does not know the exact motivation as to why these false oaths and omissions were important to the defendants, it nevertheless is clear that they were.

The denial of the debtors' discharge is an extraordinary remedy that the court rarely invokes. The facts in this case are egregious, however, and warrant the denial of the defendants' discharge.

For the reasons stated above, the court concludes that the plaintiff has established two of the three bases upon which it seeks to deny the discharge to the defendant/husband. The plaintiff has also established one of the three bases upon which it seeks to deny the discharge to the defendant/wife.

Accordingly, the court will deny the defendants' discharge. Pursuant to the provisions of F.R.B.P. 7054(b), the plaintiff shall be entitled to taxable costs provided that the plaintiff files its detailed, itemized, supported, and sworn bill of costs within the time prescribed in L.B.R. 7054–1.

The court is contemporaneously entering judgment consistent with this memorandum of decision.